THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRED SIAS, Defendant-Appellant.

First District (1st Division)    No. 80-837

Opinion filed December 22, 1980.—Rehearing denied January 19, 1981.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Jeremiah W. Lynch, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

Fred Sias brings this appeal from his conviction on two counts of aggravated battery for which he was sentenced to a minimum of 4 years and a maximum of 12 years. He raises the following issues on appeal: (1) whether the court erred in admitting a hearsay account of an out-of-court identification of the defendant into evidence; and (2) whether the court erred in sentencing the defendant to the extended term provision in effect at the time of the offense.

We affirm.

The testimony at the trial reveals the following facts. Maurice Broderick, the complaining witness, testified that he left work at approximately 7:50 a.m. on the morning of October 28, 1977, after working the

midnight shift as general foreman at the 400 North Pulaski facility of the Chicago and Northwestern Railroad. He explained that he exited the plant and walked two blocks to the steps that go down to Pulaski Road so that he could catch the Lake Street elevated train. He did not have his reading glasses on at this time. As he reached the sidewalk at the bottom of the stairs an employee of the railroad, whom he recognized as Fred Sias, approached him. When the two men were approximately two feet apart, the defendant said, "Maury, you are not on company property now." In the conversation which ensued, Broderick addressed Sias by name and explained to him that each of them had a responsibility to perform his own job at the shop. This referred to the fact that Broderick had recently written a report concerning Sias' work performance. During this conversation the two men agreed to return to the shop and talk to the shop superintendent about Sias' grievance with Broderick concerning the report. However, as Broderick headed up the stairs to return to the shop, Sias shot him in the face and then the buttocks. Broderick returned to the shop where he met Ben Gerlock, another general foreman, who asked him what had happened. Broderick told Gerlock that Sias shot him. As a result of his injury, Broderick suffered paralysis of his vocal chords, the left side of his tongue, and his left arm. Additionally, his saliva gland and the muscles in his left shoulder were damaged.

Broderick further testified that he had worked for the railroad for 36 years. While he had never directly supervised Sias, who had been employed by the railroad for two years, Broderick had supervised foremen directly over Sias in his capacity as general foreman. In his capacity as general foreman and after receiving complaints from foremen that they could never find Sias, Broderick had written three reports concerning Sias. The last report was written a week prior to the shooting incident. Broderick stated that he had no personal feelings against Sias which caused him to prepare these reports. He noted that, after writing the second report, Sias told him that he should "get off his back" and that he knew which way Broderick went home. While Broderick could not remember talking to investigating police officers subsequent to the incident in the emergency room, ·he did remember talking to police officers and viewing pictures they brought him a few days after the incident.

Two additional witnesses testified for the State. Gerlock substantiated Broderick's testimony that at a few minutes after 8 a.m. on the date of the incident, Broderick entered the shop bleeding and told him what had happened. Police officer Robert Podgorny testified that he and his partner went to the hospital where Broderick had been taken for emergency care to interview him. After this interview, Podgorny testified that he and his partner attempted to locate Sias at two addresses which

they had obtained from his employment file. The next day the police officers went to the hospital with a photograph of Sias and four other photographs. Podgorny testified that the victim picked out Sias' picture when asked to identify the man who shot him. This testimony was allowed over a defense objection that such testimony was hearsay. Upon finding out that Sias' brother Charles was a police officer, police officer Podgorny made arrangements to have defendant's brother surrender the defendant. Thereafter, Sias did voluntarily come down to the station where he was booked. After this testimony the State rested and the defense moved for a directed verdict. The directed verdict was denied after argument by both parties.

Jim Bishop, a fellow employee of Sias, testified for the defense that on the night prior to the incident, he and Sias attended a concert. After stopping for a few drinks and playing several games of chess, the two men retired around 2 a.m. Bishop testified that he slept on Sias' couch and that Sias slept in his bedroom. Bishop awoke about 7:30 a.m. and quickly got ready for his 8 a.m. shift. He left Sias' apartment somewhere between 7:40 a.m. and 7:50 a.m. while Sias was still asleep. It took about 7-10 minutes to reach the plant from Sias' apartment. On cross-examination, Bishop admitted that he did not know Sias' whereabouts after he left Sias' apartment.

Also testifying for the defendant was his brother, Charles Sias, who testified that his brother, Fred, called him the day after the incident and told him that he had heard from his friends that the police were looking for him. The defendant was charged after surrendering himself at the police station. The defense rested at this juncture.

In rebuttal, the State presented the testimony of Craig Russell, who testified that he worked for the Chicago and Northwestern Railroad at the Pulaski Road plant. He stated that on October 28, 1977, he had just arrived to work the first shift when he saw the defendant at about 7:20 or 7:30 a.m. Later, at about 7:50 a.m., as he was waiting to start his shift, he again saw Sias. This time Sias was walking near the north exit of the plant which is near the Pulaski Road exit. We note that the defendant was not scheduled to work until 4 p.m. that day and that it was stipulated at trial that the defendant did not work on the day of the incident. On cross-examination, discrepancies in Russell's court testimony and his testimony at the company hearing were revealed as to what day Russell had seen Sias before work and whether he had seen him once or twice that morning.

The jury returned a conviction on the aggravated battery charges. Subsequently, the defendant filed a motion for judgment of acquittal and for a new trial. These were denied. At the sentencing hearing, several witnesses testified in aggravation and mitigation. Among those to testify

was Robert Hester, an employee of the railroad, who stated that Sias had called him to ask him to start a rumor at work that a Robert Salinas had shot the complaining witness. At the sentencing hearing the defendant was allowed to elect whether he wished to be sentenced under the extended term provision which existed at the time of the commission of the offense or the provision which existed at the time of sentencing. The defendant elected to be sentenced under the law in effect at the time of the commission of the offense. After considering the presentence report, the trial court sentenced the defendant to a term of from a minimum of 4 years to a maximum of 12 years. A timely notice of appeal was subsequently filed.

The defendant's first argument is that the admission of Officer Podgorny's hearsay identification testimony was reversible error because it was used to strengthen and corroborate an otherwise weak identification by complaining witness Broderick. We have examined the record, as recently amended to include the defendant's post-trial motion, and find that this issue was not raised by the defendant in his post-trial motion. It is a well-established proposition in Illinois that issues not raised in a defendant's post-trial motion are waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Nelson* (1968), 41 Ill. 2d 364, 243 N.E.2d 225; *People v. Reynolds* (1980), 85 Ill. App. 3d 549, 407 N.E.2d 64.) The waiver rule was created to encourage defendants to specify alleged errors in a motion for a new trial in order to "eliminate unnecessary reviews and reversals" where the motion is meritorious. (*People v. Irwin* (1965), 32 Ill. 2d 441, 444, 207 N.E.2d 76.) An exception to this rule exists, however, if the alleged error, which would otherwise be subject to the waiver rule, constitutes plain error under Supreme Court Rule 615(a). (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a); *People v. Pickett*; *People v. Coleman* (1980), 83 Ill. App. 3d 429, 403 N.E.2d 1266; *People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68.) Under that provision, any errors "affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. Rev. Stat. 1977, ch. 110A, par. 615(a).

The rule concerning whether the admission of hearsay identification testimony constitutes plain error is succinctly stated in *People v. Smith* (1978), 59 Ill. App. 3d 480, 375 N.E.2d 941:

> "* * * the admission of hearsay identification testimony constitutes reversible error only when used as a substitute for in-court identification or when introduced to strengthen and corroborate a weak identification. If the hearsay testimony is merely cumulative [citations], or is supported by a positive identification and other corroborative circumstances [citation], it constitutes harmless error [citation]. It has further been held that if the person who made the out-of-court identification is present, testifies to his prior identifica-

tion and is subject to cross-examination, the purpose of the hearsay rule is satisfied. [citation.]" (59 Ill. App. 3d 480, 489-90.)

When the facts of the present case are analyzed in terms of this rule, it is clear that the admission of Officer Podgorny's testimony was inadmissible hearsay. (*People v. Rogers* (1980), 81 Ill. 2d 571, 411 N.E.2d 223; *People v. Robinson* (1978), 73 Ill. 2d 192, 383 N.E.2d 164; *People v. Anthony* (1980), 90 Ill. App. 3d 859, ___ N.E.2d ___; *People v. Grier* (1980), 90 Ill. App. 3d 840, 413 N.E.2d 1316; *People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746.) The question then turns to whether the hearsay identification testimony was used as a substitute for an in-court identification or was used to strengthen and corroborate a weak identification and consequently constituted plain error.

■■ In the instant case the victim worked with the defendant and had known him for approximately two years. Moreover, during the incident he addressed the defendant by name while conversing with him and viewed him from a distance of only a few feet. Indeed, he had written the third of three reports on defendant's work only a week prior to the incident and had been threatened by the defendant for writing an earlier report. As a result of this contact, the complaining witness identified the defendant as his attacker within a few minutes of the incident to a fellow worker and later that day to investigating police officers. He also made an in-court identification of the defendant. Furthermore, his identification was corroborated by the testimony of a co-worker of the defendant which placed the defendant at the scene prior to the shooting. While the defendant did produce the testimony of Bishop, the purported alibi witness, a close examination of Bishop's testimony reveals that he had no idea where the defendant was at the exact time of the offense and that the defendant could have made the distance from his apartment to the shop within the time that Bishop left the apartment and the time that Broderick testified that he was shot. The defendant urges that the identification was questionable because Broderick did not have his glasses on during the incident. However, the defendant has produced no evidence that Broderick's vision was so impaired that it affected his ability to identify the defendant by sight. Accordingly, we find that the admission of the hearsay identification testimony, although inadmissible, did not act as a substitute for an in-court identification but was merely cumulative of a positive identification and corroborative circumstances, and, as such, it did not constitute plain error. *People v. Robinson; People v. Anthony; People v. Grier.*

The defendant cites *People v. Ford* (1974), 21 Ill. App. 3d 242, 315 N.E.2d 87, and *People v. Johnson* (1979), 68 Ill. App. 3d 836, 386 N.E.2d 642, in his argument that the instant hearsay identification testimony merely served to corroborate an otherwise weak identification in a close

case. We find neither factually analogous to the instant case. In *Ford*, while the witness did make an in-court identification of the defendant, as did the complaining witness in the instant case, her identification was less than clear because she had seen her assailant for only a few seconds, from a side view, and at a distance of 15 feet. Under these facts, the court found that the introduction of the hearsay identification testimony from the police officer regarding the complaining witness' out-of-court identification required a new trial as it merely served to corroborate a less than positive identification. In *Johnson*, one witness testified as to her lineup identification of the defendant and then made an in-court identification. Subsequently, two witnesses testified as to an out-of-court identification made by a witness who did not testify at the trial. This testimony was emphasized in closing argument by the State. In holding that reversible error occurred, the court rejected the State's argument that the positive identification of the one witness and corroborative circumstances made the admission of the hearsay harmless. The court held that the hearsay identification testimony was mentioned three times and that, while the identification by the witness who testified alone may have been sufficient to convince the jury, the effect of the hearsay identification on the jury could not be ignored especially where the corroborative circumstances were not so overwhelming as to ameliorate the effect of the error.

■■ The defendant next argues that he was improperly sentenced under the extended-term provision in effect at the time of the offense (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—2) because (1) the court failed to provide for the defendant's presentence commitment as required under that provision, and (2) the court relied upon the wrong standard in determining the defendant's eligibility for an extended term. We turn first to the allegation concerning the presentence commitment requirement. The pertinent statutory provision requires:

> "(b) A sentence under this Section shall not be imposed unless the defendant has been committed for examination and report before sentencing under Section 5—3—3."

The defendant asserts, citing *People v. Jerrick* (1978), 62 Ill. App. 3d 914, 379 N.E.2d 1295, and *People v. Haak* (1975), 25 Ill. App. 3d 105, 323 N.E.2d 145, that the commitment requirement was a condition precedent to sentencing under the extended term provision and, therefore, the defendant's sentence must be vacated and the cause remanded for resentencing. We do not agree. Under Illinois law, where a defendant has been charged with an offense which was amended subsequent to the commission of the offense, but prior to sentencing, he may elect to be sentenced under the law in effect at the time of the offense or the law in effect at the time of the sentencing. (Ill. Rev. Stat. 1977, ch. 131, par. 4;

*People v. Hollins* (1972), 51 Ill. 2d 68, 280 N.E.2d 710; *People v. James* (1970), 46 Ill. 2d 71, 263 N.E.2d 5; *People v. Finley* (1980), 82 Ill. App. 3d 307, 402 N.E.2d 769.) This provision avoids the constitutional prohibition against *ex post facto* laws. (*People v. Finley*.) An *ex post facto* law is one which makes an act criminal which was not so at the time it was performed or which increases the punishment or penalty involved. (*Dobbert v. Florida* (1977), 432 U.S. 282, 53 L. Ed. 2d 344, 97 S. Ct. 2290; *People v. Finley*; 16A Am. Jur. 2d *Constitutional Law* §635 (1979).) Furthermore, it has been held that the *ex post facto* prohibition has no application to changes which relate exclusively to a remedy or mode of procedure. (*People v. Gonzalez* (1974), 56 Ill. 2d 453, 308 N.E.2d 587; *People v. McKinney* (1968), 40 Ill. 2d 372, 240 N.E.2d 577; *People v. Johnson* (1961), 23 Ill. 2d 465, 178 N.E.2d 878, *cert. denied* (1962), 371 U.S. 881, 9 L. Ed. 2d 117, 83 S. Ct. 153; 16A Am. Jur. 2d *Constitutional Law* §646 (1979).) While there appears to be no absolute rule available to determine whether a provision of a statute is procedural or substantive in nature, we believe that resort to the definition of an *ex post facto* law is instructive in this regard. A change which does not make an act punishable which was not punishable at the time it was committed, or does not increase the severity of the punishment of an act after its commission should be considered procedural. As one treatise has noted:

"Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition against ex post facto laws cannot be embraced within a formula or stated in a general proposition, the distinction being one of degree. It has been stated, however, that the Constitutional prohibition was intended to secure substantial personal rights against arbitrary and oppressive legislation, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." 16A Am. Jur. 2d *Constitutional Law* §646, at 609 (1979).

■■ From the foregoing authority, we conclude that the commitment provision of the prior extended term provision, although mandatory where the extended term provision is applied in its own right (*People v. Jerrick*; *People v. Haak*), pertains only to a procedural aspect of the defendant's sentence and, therefore, did not have to be applied in the situation where a defendant elected to be sentenced under that provision. This provision does not affect any of the defendant's substantial personal rights in that it did not make any act of the defendant criminal which was not already criminal and did not increase the defendant's sentence. Accordingly, it was not error for the trial court to fail to require the defendant's commitment prior to sentencing for evaluation.

The defendant also asserts that his sentencing under the prior

extended term provision was improper in that the trial court utilized the standard for sentencing under the new extended term provision (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—2), while the defendant elected to be sentenced under the prior act (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—2). The defendant asserts that, in that the trial court specifically noted in the sentencing hearing that the defendant's actions were heinous, the court clearly applied the wrong standard. It is also argued that the defendant is not a danger to the public because he is a "productive, intelligent, young man who is of value to his community," has been steadily employed as a truck driver since the incident, is actively involved in the local Y.M.C.A., and is generally involved in his community. The State contends that it was the State's position at the sentencing hearing that the extended term could be applied under either act and, therefore, the trial court considered the standard which existed at the time of the commission of the offense.

██ The prior act provides for application of the extended term where the defendant has committed a felony in which he inflicted or attempted to inflict serious bodily injury if the defendant "presents a continuing risk of physical harm to the public." (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—2(a).) The comparable standard under the new act would apply an extended term where the "offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b)(2).) We do not find it necessary to determine whether these standards are procedural or substantive in nature so as to determine whether they must be applied in an election situation because we believe that the trial court could have reasonably applied the extended term provision under either provision. In determining whether an extended term should be given, the trial court should look at the nature of the offense committed as well as the defendant's prior criminal record. (*E.g., People v. Haak* (1975), 25 Ill. App. 3d 105, 323 N.E.2d 145.) We believe that the trial court could reasonably have found that the defendant presented a continuing risk of physical harm to the public and that an extended period of confinement was required for the protection of the public. The court characterized the offense as a cold-blooded shooting which was premeditated. We think the record supports this finding. The defendant waited for the complaining witness, a person he had known for two years, to leave work and then after engaging him in a conversation unexpectedly shot him twice, once in the side of the face and once in the buttocks as he tried to escape. Moreover, after the incident, he tried to start a rumor as to the involvement and guilt of another employee in the offense. This type of behavior does not justify characterizing the defendant as a productive, intelligent young man who poses no threat to the public. Rather, the defendant's

actions reveal that he cannot function in a normal work environment with its attendant pressures and frustrations. While the defendant points out that his only prior offense was a theft and this offense was not a crime of violence, we do not think this fact mitigates against the circumstances of the instant offense.

In light of the foregoing, we affirm the defendant's conviction and sentence entered by the circuit court of Cook County.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.