THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAVEL DEAN, Defendant-Appellant.

First District (4th Division)   No. 84—2226

Opinion filed May 28, 1987.

James J. Doherty, Public Defender, of Chicago (Gwendolyn M. Bryant, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter Fischer, and Mary D. Mallo, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McMORROW delivered the opinion of the court:

Following a jury trial, defendant Lavel Dean was convicted of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)) and sentenced to 19 years' imprisonment. The State's evidence showed that the owner of a restaurant-lounge in downtown Chicago was robbed at gunpoint in the presence of a barmaid and a waitress. Approximately 2½ years later, defendant came into the restaurant on two separate occasions and was recognized by the owner as the person who had committed the armed robbery. In one instance, the owner followed the defendant and obtained the license plate number of the automobile the defendant was driving. On the other occasion the owner telephoned one of the other witnesses, who came into the restaurant and also recognized the defendant as the person who committed the robbery. The police were notified. The defendant was later identified in a lineup as the person who had committed the robbery in 1980.

On appeal, defendant raises the following questions for our review:

(1) Whether the identification of the defendant, made by the three witnesses 2½ years after the offense was committed, was weak and insufficient to establish guilt beyond a reasonable doubt;

(2) Whether the trial court's admission into evidence of a police officer's testimony that the defendant's girlfriend's description of the defendant matched that given by the witnesses constituted reversible error.

(3) Whether the defendant was denied the opportunity to present his defense, in that a police officer failed to respond to a subpoena, and the trial court denied defendant's motion for a continuance to secure the officer's presence, where the officer would have testified that the police report did not show that any of the witnesses stated after the crime that the perpetrator had a facial birthmark;

(4) Whether certain statements of the trial court during trial were improper and prejudicial such that defendant was denied a fair trial;

(5) Whether the defendant is entitled to a new sentencing hearing, on the ground that the court relied upon evidence of another armed robbery of which defendant was accused but later found not

guilty.

We determine that the State's evidence was sufficient to find defendant guilty beyond a reasonable doubt and that no reversible error occurred to deprive defendant of a fair trial. Accordingly, defendant's conviction for armed robbery is affirmed. Because the trial court's sentencing decision relied upon evidence of another crime for which defendant was subsequently found not guilty, however, we vacate the defendant's sentence and remand for a new sentencing hearing.

BACKGROUND

Defendant was convicted of the September 29, 1980, armed robbery of George Korkofigas (Korkofigas), the owner of the Royal House Lounge and Restaurant (the lounge), in the presence of Judy Stimple (Stimple), the barmaid at the lounge that evening, and Tina Knight (Knight), a waitress at the lounge that evening.

Korkofigas, Knight, and Stimple gave similar accounts of the armed robbery. According to their testimony, Korkofigas was behind the bar checking the cash register. Stimple, the barmaid, was also behind the bar. Knight, a waitress, was sitting outside the bar on a barstool. A man, later identified as the defendant, walked up to Knight while holding a gun and told her to go around behind the bar where Stimple was sitting. The robber then walked over toward Korkofigas at the register. He pointed the gun at him, handed him a plastic bag, and told him to put "all the money" in the bag. Korkofigas took all of the money from the register and his person and placed it in the bag. Korkofigas, Stimple, and Knight testified that they looked at and watched the robber as he confronted Knight, directed her to go behind the bar, and ordered Korkofigas to put the money in the bag.

The man then ordered the two women to lie down on the floor, where they remained for about a minute. The robber then told them to get up. All three witnesses testified that they were looking directly at their assailant at this time. He ordered them to walk around the bar, into the lounge area, and then into the lobby. He then told Knight and Stimple to go into the men's washroom. Korkofigas and the robber went into the office. Inside the office, the man told Korkofigas to remove the money that was inside the safe and to place the money into the same bag which held the register cash. Korkofigas did as directed. The man then told Korkofigas to remain in the office, took the plastic bag, and left the office. Korkofigas then called the police.

The three witnesses testified to the effect that the offender had been a male black, from 5 feet 8 inches to 5 feet 10 inches tall and 150 to 175 pounds, and was wearing a jacket, a cap, and shirt and pants. Each further stated that the robber was wearing sunglasses and had a beard, a moustache, and a birthmark or discoloration on the left side of his face. In addition, Stimple and Knight testified that the birthmark was located over his left eye and cheek.

Korkofigas, Stimple, and Knight testified that they gave their descriptions to the two officers of the Chicago police department who arrived at the lounge in response to Korkofigas' telephone call shortly after the robbery. Each identified the defendant in court as the man who had committed the robbery. There is no dispute in the record that the defendant at trial had a birthmark on the left side of his face.

Stimple and Knight also stated that they had seen and spoken to the robber earlier in the evening on which the crime occurred. Stimple stated that she had seen the robber in the bar about half an hour before the crime. The man asked Stimple where the manager was and stated that he wanted to talk to the manager about renting out the restaurant on a Saturday night. Stimple told the man that the manager was in his office. When she asked him if he wanted her to call the manager, the man replied that he knew where the office was and left.

Knight testified that she had seen the robber earlier in the evening, a little after 8 p.m. The man walked midway into the lounge and asked Knight where the manager was. Knight was looking at the man and could see his face. She told the man that the manager was in his office. The man walked out of the lounge door into the lobby. Knight had never seen the man prior to that evening.

Korkofigas and Stimple both stated that the robber had been a regular customer of the lounge at Saturday night parties and had been in the lounge once or twice a month for approximately a year prior to the incident. Approximately 150 to 250 persons usually attended the parties. Most of the persons were recurring Saturday night customers. The lights were dimly lit on Saturdays during the parties.

Korkofigas testified that one Saturday in December 1982 at approximately 1 a.m. the man who had committed the armed robbery came into the lounge and had a drink. He was there for approximately 30 minutes to an hour. Korkofigas followed him after he left the establishment. The man got into an old model, black Pontiac. Korkofigas wrote the license plate number on a piece of paper and

testified to that number at trial. He did not notify the police because he "figured it's two and a half years later" and because he "ha[d] to be very careful about any accusations" that he made. He also wanted either Stimple or Knight to take a look at the man before notifying the police and thought that the man would return to the lounge.

On Saturday, February 5, 1983, Korkofigas again saw the robber in the lounge in the evening and telephoned Stimple, who worked nearby. The man recognized by Korkofigas as the robber was still in the lounge when Stimple arrived. She sat at one of the barstools, looked around, and saw the defendant standing near the bar. While she was looking at him, he looked at her for a while, then turned around and walked out into the lobby. Stimple followed him into the lobby, because she wanted a closer look at him, and stood near him while he talked to another person. After she had a brief conversation with the person to whom defendant was speaking, the defendant left the lobby. Korkofigas called the police after Stimple confirmed that the man in the lounge that evening was the one who robbed them 2½ years earlier. When the police arrived, Korkofigas gave them the license plate number he had written down in December 1982.

Korkofigas and Stimple identified the defendant in a five-man lineup at a Chicago police station on February 10, 1983. Knight saw photographs in March 1983 of the five-man lineup, from which she identified the defendant as the robber. No one else in the lineup, except the defendant, had a facial birthmark.

Detective Pat Carroll of the Chicago police department testified that in February 1983 he was assigned to investigate the September 1980 robbery at the lounge. After giving Carroll a description of the robber, Korkofigas told Carroll that he saw the same man in the lounge on a Saturday in December 1982, but that he was not "absolutely sure" that this was the man who robbed him in September 1980. He gave Carroll a number to an automobile license plate, which Carroll restated at trial. The car was a 1973 Pontiac registered to Cassandra Holly of Chicago.

In questioning Holly, she stated that her boyfriend, Lavel Dean, used the car on occasion. She provided Carroll with his address and gave him a description of Dean. Carroll testified that "[s]he described him exactly like the victim had described him *** [i]ncluding the birthmark."

Carroll subsequently had a conversation with Dean at the location supplied to him by Holly. When Carroll told Dean that he was investigating a robbery of the lounge in September 1980, Dean denied any knowledge of any robbery. Dean went with Carroll to a Chi-

cago police station, where he appeared in a lineup and was positively identified by Korkofigas and Stimple as the robber. Carroll then interrogated Dean at the police station. Dean at all times denied that he had committed the robbery. He stated that he used to go to the lounge, but that he had stopped going there approximately three years earlier. Dean also said that he had been there a few months prior to February 1983 and had also been there the Saturday night prior to the police interrogation of him.

Edgar Lucas, who testified on behalf of the defense, stated that he rented sound and band equipment to various organizations for social functions, including Saturday night parties at Korkofigas' lounge, and that the defendant had worked for him at this activity since 1967. Lucas recalled that in March or April 1983 he and defendant provided sound equipment for a Saturday night set at the lounge and that Korkofigas was there on that occasion. He could not remember whether he was at the lounge on September 29, 1980. Lucas stated that Korkofigas never said anything to Lucas about an armed robbery that occurred in September 1980 or that defendant was involved in that robbery.

Yvonne Jefferson testified that she met the defendant at a social club in 1959 and had seen him at various social activities since that time. She stated that she had been at Korkofigas' lounge quite frequently for club sets on Friday and Saturday nights in 1981, 1982, and 1983 and that she had seen the defendant at many of these parties. She had seen the defendant at the lounge for club sets on at least two occasions in 1983, and he was at a club birthday party for Jefferson at the lounge in March or April 1983. Jefferson had spoken to Korkofigas on numerous occasions. She stated that Korkofigas never said anything to her about an armed robbery at the lounge.

The State presented the testimony of three rebuttal witnesses. Korkofigas related that he did not know Lucas and never saw Lucas with the defendant or anyone involved in set operations. Korkofigas said that Lucas had never been a regular operator of a set and that the regulars were Leslie Richmond and his partner, Ernest. Stimple also testified that the usual set operators were Leslie Richmond and Ernest. She stated that she had never seen Lucas working at the lounge and that she did not know his name. Leslie Richmond testified that he worked at the lounge as a set operator on a regular basis, either every weekend or every other weekend, on Saturday nights. Richmond stated that he knew Lucas and that Lucas had worked for him at the lounge on two occasions.

Defendant was convicted of armed robbery and sentenced to 19

years' incarceration. This appeal followed.

OPINION

I

Defendant argues that the State's identification evidence was insufficient to prove him guilty beyond a reasonable doubt.

■ The positive identification of an accused by a single eyewitness is sufficient to sustain a conviction. (*People v. Johnson* (1986), 114 Ill. 2d 170, 189, 499 N.E.2d 1355.) An identification is considered positive, and thus reliable, where the witness had a sufficient opportunity to view the offender, showed an adequate degree of attention to the characteristics of the assailant, described the perpetrator with a reasonable degree of accuracy, displayed a sufficient amount of certainty in identifying the offender, and identified the accused within a reasonable period of time following the crime. *People v. Taylor* (1986), 143 Ill. App. 3d 252, 255, 492 N.E.2d 1011.

■ ■ "Generally, identifications are based upon the 'total impression' of the witness rather than on a single distinguishing feature. [Citations.]" (*People v. Taylor* (1986), 143 Ill. App. 3d 252, 255, 492 N.E.2d 1011, 1013.) As a result, discrepancies in the initial description of an assailant's physical characteristics usually do not affect the credibility of the identification, but merely reflect the weight to be given to the identification testimony. (*People v. Trass* (1985), 136 Ill. App. 3d 455, 463, 483 N.E.2d 567; *People v. Bias* (1985), 131 Ill. App. 3d 98, 104-05, 475 N.E.2d 253; *People v. Lumpkin* (1975), 28 Ill. App. 3d 710, 713-14, 329 N.E.2d 262, *appeal denied* (1975), 60 Ill. 2d 599.) Similarly, the lapse of time between the offense and the subsequent identification affects the weight to be given to the identification testimony, but does not destroy its credibility. *People v. Rodgers* (1972), 53 Ill. 2d 207, 214, 290 N.E.2d 251; *People v. McDowell* (1984), 121 Ill. App. 3d 491, 498-99, 459 N.E.2d 1018, *appeal denied* (1984), 101 Ill. 2d 549; *People v. Baker* (1980), 82 Ill. App. 3d 240, 245, 402 N.E.2d 662, *appeal denied* (1980), 81 Ill. 2d 594.

■ Defendant contends that the witnesses' observations of him while he was a patron or set worker at the lounge were casual, such that Korkofigas, Stimple, and Knight confused him with the person who actually committed the offense. The defendant suggests that this "unconscious transference" rendered the witnesses' identification of him so doubtful that it cannot support his conviction. The case of *People v. White* (1978), 56 Ill. app. 3d 757, 372 N.E.2d 691, upon which defendant relies, is distinguishable from the facts in the instant case.

In *White*, the victim's viewing of the offender was only "casual" during the time period when the offense was committed. The record here shows that the witnesses' viewing of the defendant on the night of the robbery was substantially more significant than "merely casual." All three witnesses testified that they were looking directly at the robber when he entered the lounge and when he held the group at gunpoint and ordered Korkofigas to put the money from the register and his pockets into the plastic bag. During this time, they were in close proximity to him and the lighting in the lounge was good. Once the robber had directed the group into the lobby, all three again looked at him; the lighting in the lobby was also sufficient for them to see the robber clearly. Under these circumstances, we are unable to conclude that the witnesses' identification of the defendant was unreliable. The defendant's premise that their identification of him was mistaken because they had seen the defendant on other occasions in the lounge both before and after the robbery is without merit.

■ Defendant also maintains that the witnesses' identification of him was insufficient to prove him guilty beyond a reasonable doubt because their testimony showed that the identification was doubtful, vague, or uncertain. He points out that the witnesses did not identify him as the person who committed the armed robbery until more than 2½ years after the crime occurred, even though they knew him because he frequented the lounge and worked there with Lucas on numerous occasions. Defendant also observes that Korkofigas told the police in February 1983 that he was not sure that the defendant was the robber and that none of the witnesses informed the police in September 1980 that the offender had a facial birthmark or some facial discoloration.

Our scrutiny of the record establishes that the witnesses' identification of the defendant was not so doubtful, vague, or uncertain that his conviction should be reversed on appeal. The witnesses had ample opportunity to see him clearly during the robbery. Each gave the police a clear description of the robber following the crime, stating his height, weight, age, clothing, and facial characteristics. Defendant was positively identified in the police lineup by Korkofigas and Stimple, and Knight identified him from photographs of the lineup. All claimed that they told the police in September 1980 that the robber had a facial birthmark. It was the province of the jury to resolve the conflicting evidence regarding the matters which defendant now urges for reversal. (See *e.g., People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 206 S. Ct. 267; *People v. McKay* (1985), 138 Ill. App. 3d 446, 450-51, 485

N.E.2d 1257.) Based on the record before us, we are unable to conclude that the jury's determinations on these questions were clearly erroneous.

## II

■ Defendant contends that the trial court committed reversible error when it permitted Detective Carroll, the investigating officer, to testify to details of his conversation with the defendant's girlfriend. Specifically, Detective Carroll testified that defendant's girlfriend described him "exactly like the victim had described [the defendant] *** [i]ncluding the birthmark." Defendant maintains that his defense was prejudiced by this testimony because the State employed the out-of-court statement of defendant's girlfriend "to bolster the weak identification testimony of the other State's witnesses who testified based on their recollection of a person and an event two and one-half years earlier."

Although the trial court's allowance of Carroll's testimony regarding the substance of his conversation with the defendant's girlfriend was error (see *People v. Stout* (1982), 110 Ill. App. 3d 830, 443 N.E.2d 19; *People v. Sias* (1980), 91 Ill. App. 3d 1095, 415 N.E.2d 618; *People v. Johnson* (1979), 68 Ill. App. 3d 836, 386 N.E.2d 642), we are not able to conclude that the admission of this testimony prejudiced the defendant at trial.

The substance of the defendant's girlfriend's remarks pertained to his physical appearance in 1983, when Detective Carroll spoke to her. Yet it was the witnesses' description of the offender in 1980 that defendant challenged. Furthermore, Carroll gave detailed testimony regarding the description of the offender which Korkofigas and Stimple provided to him in February 1983 before Carroll spoke with defendant's girlfriend and later defendant himself. Consequently we cannot determine that Carroll's testimony served to bolster the witnesses' identification of the defendant as the man who committed the armed robbery in September 1980. (Cf., *People v. James* (1981), 100 Ill. App. 3d 884, 890, 427 N.E.2d 248.) On this record, the error did not prejudice the defendant such that he would be entitled to a new trial.

## III

■ Defendant claims that the trial court committed reversible error when the court denied defendant's request for a continuance or service of a subpoena for compulsory appearance upon a police officer whose testimony was, according to the defendant, crucial to his de-

fense. The officer would have testified to the effect that his police report, concerning his interviews of the witnesses in September 1980, did not include a notation that the witnesses said their assailant had a facial birthmark.

Assuming that the trial court's rulings were erroneous, we cannot say that such error prejudiced the defendant so that he would be entitled to a new trial. Our review of the record indicates that the absent officer's testimony would have been cumulative to the testimony of Detective Carroll, who interviewed Korkofigas and Stimple in February 1983. Carroll stated during cross-examination that he reviewed the police report prior to his discussions with Korkofigas, Stimple, and Knight and that he did not know until he spoke to them that they had told the police, in September, 1980, that the robber had a facial birthmark.

Defense counsel's closing argument to the jury drew attention to this testimony. The defense attorney observed that Detective Carroll had reviewed the police reports from September 1980 but was unaware, until he later spoke with Korkofigas, that the robber was alleged to have a facial birthmark. The defendant's attorney also argued to the jury that the witnesses may therefore have been mistaken when they testified they told the police in September 1980 about their assailant's birthmark. Thus, the jury was made aware that Carroll's testimony indicated that the witnesses may not have told the police in September 1980 that the men who robbed them had a facial birthmark. Because the evidence which defendant unsuccessfully attempted to offer was merely cumulative to other testimony brought out and argued to the jury by defendant at trial, we are unable to say that the trial court's refusal to grant a continuance or to issue compulsory service here amounted to reversible error. See, *e.g.*, *People v. King* (1977), 66 Ill. 2d 551, 558, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273; *People v. Edwards* (1973), 55 Ill. 2d 25, 33-34, 302 N.E.2d 306, *cert. denied* (1974), 415 U.S. 928, 39 L. Ed. 2d 486, 94 S. Ct. 1438.

## IV

■ Defendant maintains that certain of the trial court judge's comments during the course of the trial denied him a fair trial. Our review of the record shows that the trial court judge's remarks, although improper, were not openly hostile or antagonistic to the defense when viewed in their overall context. We are therefore unable to conclude that the conduct of the trial judge was so prejudicial or biased that defendant was deprived of a fair trial. See *People v. Merz*

(1984), 122 Ill. App. 3d 972, 978-80, 461 N.E.2d 1380; *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936-38, 449 N.E.2d 568, *appeal denied* (1983), 96 Ill. 2d 545.

## V

■ Defendant argues that his sentence should be vacated and a new sentencing hearing held because the trial judge's sentencing decision was expressly based upon evidence pertaining to another armed robbery charge for which defendant was later found not guilty. We agree.

Evidence that defendant may have committed another crime was admissible at the sentencing hearing when it was held by the trial judge, although the evidence should have been admitted with caution and due "sensitivity to the possibilities of prejudice to defendant if inaccurate information is considered." (*People v. La Pointe* (1982), 88 Ill. 2d 482, 499, 431 N.E.2d 344, 351.) If that evidence had been the result of a conviction which was later reversed subsequent to the court's imposition of sentence, this court would be compelled to vacate the sentence and remand the cause for a new sentencing hearing. (See *United States v. Tucker* (1972), 404 U.S. 443, 446-49, 30 L. Ed. 2d 592, 92 S. Ct. 589; *People v. Henderson* (1981), 95 Ill. App. 3d 291, 297, 419 N.E.2d 1262; *People v. Beyah* (1979), 72 Ill. App. 3d 690, 697, 391 N.E.2d 96; see also *People v. Eshaya* (1986), 144 Ill. App. 3d 757, 766-67, 494 N.E.2d 772; *People v. Krankel* (1985), 131 Ill. App. 3d 887, 896-97, 476 N.E.2d 777.) In our view the same result is mandated where, as here, the defendant is subsequently found not guilty of armed robbery based upon evidence which the trial judge expressly relied upon in imposing sentence. The defendant's sentence is therefore vacated and the cause remanded for a new sentencing hearing before a different judge than the one who imposed sentence herein. (See, *e.g., People v. Kendrick* (1982), 104 Ill. App. 3d 426, 435-36, 432 N.E.2d 1054, *appeal denied* (1982), 91 Ill. 2d 563.) In view of this disposition, we do not consider defendant's additional claim that the sentence imposed in the instant cause was excessive.

For the reasons stated, the defendant's conviction of armed robbery is affirmed, the sentence imposed therefor is vacated, and the matter remanded for a new sentencing hearing.

Affirmed in part; vacated and remanded in part.

JIGANTI and LINN, JJ., concur.