THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ALEXANDER HEREDIA, Defendant-Appellant.

First District (3rd Division) No. 1—86—2017

Opinion filed December 28, 1989.—Rehearing denied February 27, 1990.

Dennis A. Giovannini and Herbert L. Goldberg, both of Giovannini & Goldberg, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Thomas V. Gainer, Jr., John A. Gasiorowski, and Christine C. Perille, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant-appellant, Alexander Heredia (Heredia), was charged with murder and armed violence in connection with his wife's death. After a bench trial, Heredia was found guilty of voluntary manslaughter and sentenced to 24 years' imprisonment. Heredia appeals the conviction and sentence.

On appeal, Heredia argues that (1) the court abused its discretion in sentencing him to 24 years where the court considered improper materials in the presentence report, made findings which were inconsistent with the facts presented at trial and considered improper testimony during the hearing in aggravation; (2) the court erred in finding him guilty of voluntary manslaughter where the State failed to negate theories that the death was a result of an accident or reckless conduct; and (3) the prosecution committed reversible error by questioning him about an alleged aggravated assault of his wife and by allowing the admission of evidence regarding his prior conviction of taking indecent liberties with his daughter. We disagree and affirm.

At trial the following facts were revealed. Laura Heredia died on December 16, 1984, at the age of 29. Thirteen-year-old Lisa Heredia testified that on that date, she, her brother, David, sister, Laura, and mother resided at 7148 South Fairfield in Chicago. Heredia, her father, had not resided at the home on a consistent basis for the preceding two to three weeks.

According to Lisa, on the evening of December 16, she, David and Laura were in the living room while her parents argued for approximately one-half hour in their second-floor bedroom. Heredia insisted upon returning to the home while her mother stated that she did not want him to live there. Thereafter, her father walked out the

front door, and her mother went into the kitchen and looked out the window while she smoked a cigarette.

Lisa recalled that she went upstairs and telephoned her grandmother from her mother's bedroom. Moments later, her mother came upstairs and Heredia approached, crying and carrying a gun, which he later pointed at his temple. Lisa watched her mother attempt to hold Heredia back by placing her hands on his shoulders. Her mother did not have a weapon and did not hit or strike Heredia. Heredia pushed Laura and caused her to fall backwards on the floor. They were now out of Lisa's sight.

After informing her grandmother that her parents were fighting, Lisa concluded her conversation and called the police.

Lisa testified that she heard a struggle from inside the room and a door open and close. In addition, she heard her mother say, "Alex, don't." Lisa heard shots "right after the other," but could not recall the exact number fired. Heredia came out of Lisa's room, dropped the gun, and knelt on the floor. Lisa ran to Heredia, knelt down and held him. She got up, saw her mother lying on the floor, grabbed her little sister, and ran down the stairs and out of the house.

According to Lisa, Heredia moved out of the house in June and November of 1984. He returned to visit his children, and occasionally, they went with him to his mother's home, where he resided. On December 15, 1984, Heredia spent the night at their home on Fairfield, and the family went shopping on December 15 and 16.

Twelve-year-old David Heredia similarly testified that on December 16, 1984, he resided at 7148 South Fairfield with his mother, Laura, and two sisters and that his father would visit the home "once in a while." Heredia moved out of the home two weeks prior to December 16. David recalled his parents' 30-minute argument and saw Heredia come down the stairs and leave the house. He also observed his mother come downstairs, enter the kitchen for two minutes and then return upstairs empty-handed, followed by Lisa.

According to David, Heredia returned in five to eight minutes and climbed the stairs followed by three-year-old Laura. David heard his mother exclaim, "Why Alex?" followed by "a lot of noise and screaming." Baby Laura started to cry, and then his sisters screamed, "Daddy, no." David ran into the kitchen and remained there for 10 seconds before running out of the house. Once outside David heard five shots. He heard one shot followed by two shots, "a lot of screaming and yelling," and two additional shots. Thereafter, David ran to a neighbor's house and asked them to call the police because his parents were arguing and his father had a gun.

David testified that his father normally kept a gun in his car and that on December 16, 1984, he parked his car directly in front of the house. On December 15, 1984, his father stayed overnight at their home on Fairfield, and the family went shopping on the 15th and 16th.

On cross-examination David testified that immediately after the shooting, he told the police that Heredia returned from his car within one minute and that the five scattered shots rang out within 5 to 10 seconds.

Chicago police officer Walter Wronski testified that on December 16, 1984, at approximately 7:30 p.m., he and his partner, Cathy Branigan, responded to a call of a man with a gun at 7148 South Fairfield. Upon arrival he spoke with Lisa Heredia, who stated that her father was in the house with a gun and that she heard him shoot the gun. Once in the house Wronski heard someone crying and called out "come to the stairs and show me your hands." Heredia responded, "I can't, I hurt my wife real bad, help her."

Officer Wronski testified that after Heredia came downstairs, he handcuffed him, arrested him and advised him of his *Miranda* rights from a preprinted card. Heredia acknowledged that he understood his rights. Officer Wronski investigated the scene, recovered an automatic handgun from the second-floor hallway and observed bullet casings and a pool of blood on the floor in one of the bedrooms. At the police station, Wronski readvised Heredia of his rights.

Chicago police detective John Smith also investigated the scene and observed blood on the floor just inside the door, a number of shell casings strewn on the floor, and two spent bullets. Smith found a bullet in the bedroom closet. There was no blood on the closet floor.

Detective Smith was present when Assistant State's Attorney Dawn Overend spoke with Heredia. Overend advised him of his rights and explained her role in the investigation. Heredia stated that he understood the rights and agreed to make a statement. Detective Smith related the following:

> "[Heredia] informed Miss Overend at that time him [*sic*] and his wife had been separated, that he had gone over to the house that evening to talk to her, that an argument had ensued between them at which time she laughed at him, called him a bum. He left the house, went out to his car, got his gun, returned to the house, went upstairs to the bedroom at which time she continued laughing. He fired the gun, she ran into the closet, he fired into the closet, she came out of the closet

and he fired the gun again. He could not remember how many times he fired."

Assistant State's Attorney Overend related that on December 16, 1984, after having spoken with Lisa, David, and the police officers and read the police reports, she spoke with Heredia at approximately 11 p.m. She advised Heredia of his *Miranda* rights, and Officer Smith informed him of his wife's death. Thereafter, he gave the following oral statement:

> "He (Heredia) told me that he was separated from his wife so he wasn't living with her but had gone to the house that night and that they had begun arguing, that he had wanted to move back into the house with his wife and that she said no and he said that she was laughing at him and he said that he felt like he must mean [sic] nothing to her if she could laugh at him like that and he then said he left the house and he went out to his car and he got a gun that he keeps [sic] and I asked him at that point what kind of a gun it was and he told me a .25 caliber and it was silver and I asked him what he did then and he said he went back in the house and he went upstairs with the gun and he said that he again said something to his wife and then he shot her. *** He said that she ran into the closet and that he chased her and that he pulled her back out and then he shot her and I asked him if he knew how many times he had shot her and he said no, that he couldn't remember. *** After he shot her and he said that she fell to the ground and that he got down and tried to hold her and he said that his daughter had been upstairs when this happened."

According to Detective Smith and Assistant State's Attorney Overend, Heredia agreed to give a written statement and read the statement aloud and signed it. Overend testified that she informed Heredia that she could write down what he told her on a felony review statement form or a court reporter could come and transcribe verbatim what he would say. Heredia preferred not to have anyone else in the room and elected to have her write his statement. Overend left the room and transcribed Heredia's statement on a felony review form. At approximately 11:45 p.m., in Smith's presence, Overend showed Heredia the statement, and he read it aloud as she pointed to each word with her pen.

Overend testified that when Heredia finished reading the statement she asked him if it was the truth. He responded affirmatively and declined to make any changes. Heredia, Detective Smith and Assistant State's Attorney Overend then signed the statement.

The parties stipulated to Dr. Kirschner's postmortem examination of Laura Heredia. The cause of death was multiple gunshot wounds to the head and trunk. Specifically, there were one gunshot wound to the head, two wounds to the back, and two wounds to the abdomen. Dr. Kirschner found severe cerebral injury, in addition to injuries to the right lung, liver and small intestine. Dr. Kirschner recovered five copper-jacketed bullets of approximately .25 caliber size from the victim's body.

One wound was located in the top of Laura's head, one-half inch to the left of the midline, in the superior parietal region. The bullet entered the skull in a downward direction, passing through the medial portion of the left parietal lobe and lodged within the brain stem.

The second wound was located on the right side of her back, $10^{1}/_{4}$ inches from the top of her head, five inches to the right of the midline. The path of the bullet causing this injury was in an anterior direction downward and toward the left.

The third injury, also a back injury, was located on the left side of the back $14^{1}/_{4}$ inches from the top of her head and $2^{1}/_{2}$ inches to the left of the midline. The bullet's path was downward to the left and in a slightly anterior direction.

The fourth gunshot was located on the abdomen, 25 inches from the top of her head and $2^{1}/_{2}$ inches to the left of the midline. The bullet's path was slightly downward, in a posterior direction and toward the midline.

The fifth wound was located in the left lower quadrant of the abdomen, 26 inches from the top of her head and $2^{1}/_{2}$ inches from the left of the midline. The bullet's path was slightly downward and toward the midline of the posterior direction. With respect to all of the wounds, the doctor noted no evidence of close-range firing. The doctor noted abrasions to both knees and found no evidence of ethanol or opiates in the bloodstream. Also, the parties stipulated that the bullets originated from the gun Officer Wronski obtained in the hall of the Heredia home.

Heredia's family members, residing in his mother's home on North Oakley in Chicago, testified that since December 1984 Heredia lived in the basement apartment, appeared tired, constantly smoked cigarettes, and drank coffee.

Heredia's co-workers at Fabricated Air Systems similarly testified that in December 1984 Heredia drank a lot of coffee, smoked more and looked tired. They described him as a hardworking, nice guy. John Peterman, the company partner and shareholder, testified

that he hired Heredia in 1982 as a sheet metal worker and that within one year he advanced to the position of shop foreman. Peterman described Heredia as an excellent employee, but noted that Heredia's performance declined in December 1984. Peterman's partner, William Sterm, Jr., characterized Heredia as congenial, mild and accurate.

Heredia testified that he resided at his mother's home on North Oakley and that he had three children, Lisa, David, and Laura Rosemaria. At the time of trial, the children lived with his sister-in-law, Alma Alvarado, and Heredia was still employed by Fabricated Air Systems.

Heredia married Laura Alvarado on July 26, 1972. They purchased the home on Fairfield in early 1984. In June 1984, Heredia moved out of the home for approximately one week and a half. Heredia testified that in 1978 Laura told him that she was seeing another man.

According to Heredia, in November and December 1984 when he came home at night Laura was not there. Specifically, one evening after Thanksgiving, Laura did not come home until 6:30 a.m. the next morning. Heredia had locked the doors, and when Laura rang the door bell, he asked her where she had been. Laura responded, "none of your business." Approximately two weeks later he moved out of the house. After Thanksgiving, until December 9 or 10, Heredia stated that he experienced difficulty sleeping, averaging about four hours of sleep per night, smoked more and drank 10 cups of coffee per day.

Heredia recalled that on December 9 or 10 he bought a Christmas tree and decorated it at their home on Fairfield. Thereafter, his wife asked him to leave the house and inquired whether he was going to secure an apartment. When he refused to leave, Laura said that she would take the children and leave.

The following day, Heredia arrived at the house after work and Laura told him that she was going out. Heredia took the youngest daughter to his mother's house. Heredia testified that when he returned their daughter the following morning, Laura told him that she had been seeing another man, asked for his forgiveness and promised to stop seeing him. Heredia forgave her, and she asked him to spend the night. The next day she asked him to leave.

Early Friday morning, December 14, 1984, Heredia arrived at the Fairfield home and Laura informed him that he would have to care for the children because she was going out. Heredia asked her not to go. After work he returned, and Laura left the children under

his supervision. Heredia took the children to his mother's home.

At midnight Heredia returned to the Fairfield house, unlocked the door and waited approximately 30 minutes for Laura to arrive. Thereafter, Heredia went back to his mother's home and telephoned the Fairfield house to no avail. At 1:45 a.m., Heredia drove back to the Fairfield house and waited an hour for Laura's return.

Saturday, December 15, 1984, at 5 a.m., Heredia again went to the Fairfield house to determine if Laura had returned. He found no one home and subsequently reported to work for a half day. At 3 p.m., Laura telephoned Heredia and asked him to bring the children home. After they arrived, Heredia, Laura and the children went shopping. According to Heredia, Laura asked him to stay overnight and he agreed.

On Sunday, December 16, 1984, the family went shopping again. When they returned home, Heredia asked Laura why he had to leave and told her that he loved her. According to Heredia, Laura said that she was still seeing and had slept with another man. Laura stated that everything was Heredia's fault, she had been involved with other men and that David and Laura were not his children.

Heredia asked Laura why she was hurting him that way. She laughed and called him a faggot. Heredia replied that he wanted out, did not want to see her or anyone and left the house crying. Heredia recounted that he got his gun out of his car and returned to the house. He wanted his wife to witness his suicide. As he put the gun to his head, Laura struck him. He did not point the gun at Laura. When the gun fired, it stunned him. Laura hit him again, and he fell over the bed as the gun kept firing. Heredia had no intention of shooting his wife, but intended to kill himself in her presence. He did not recall signing his written confession.

The court found that Heredia had deliberately killed Laura, and given the circumstances, had committed voluntary manslaughter.

At the sentencing hearing, the court remarked that it had received and read numerous letters regarding the case. Defense counsel objected to the presentence investigation which contained numerous letters, arguing that the letters were not properly before the court. One of the letters, captioned "Justice for Laura Heredia," summarized the case and urged community members to write the judge and complain of the miscarriage of justice. The court ruled that the letters would be considered for what they were worth.

At the hearing in aggravation, Alma Alvarado, Laura's sister and legal guardian of her children, testified to the following. Heredia verbally abused Laura and his violence led to their repeated separations

during the 12-year marriage. In 1984, Heredia sexually abused their daughter. Also in 1984, he hit his wife with an ash tray, causing a head laceration. On cross-examination, Alvarado could not recall observing any marks, cuts or bruises on her sister.

Lisa Heredia expressed guilt regarding her mother's death since she had informed her mother of the sexual abuse. Lisa experienced difficulty concentrating in school and on school assignments. In addition, Lisa described Heredia as a "very, very, violent person," frequently hitting the children on their ears and head, using foul language and threatening to knock them "through walls." Lisa pleaded that the court sentence Heredia to the maximum term of 30 years.

On cross-examination, Lisa acknowledged that she never saw Heredia hit her mother. Lisa further testified that she gave Heredia a plaque with the inscription, "To the best daddy in the world, I love you. Merry Christmas, 1982. Lisa," and that after her mother's death when packing she put the plaque in Heredia's suitcase.

In response, Heredia testified that he threw the ash tray during an argument after Laura hit him with a pan of hot oil. In addition, Heredia asserted that he did not beat Laura or hit the children in a manner so as to hurt them. Heredia apologized to everyone for his actions, asked for his children's forgiveness and said that he loved his children and his wife.

The trial court noted that Heredia had no prior convictions for violent offenses and that he had been a hard-working man. The court found, nonetheless, that under the circumstances an extended term was appropriate since this was the second crime he had committed against a family member and sentenced him to a 24-year term of imprisonment.

On appeal, Heredia first argues that the trial court abused its discretion in sentencing him to 24 years of imprisonment upon the conviction of voluntary manslaughter where the court considered improper materials contained in the presentence report, made findings during sentencing that were inconsistent with the facts presented at trial and considered improper testimony during the hearing in aggravation. We disagree.

■ The purpose of a presentence investigation is to insure that the trial judge will have all the necessary information concerning the defendant before the court, prior to the time that sentence is imposed. (*People v. Youngbey* (1980), 82 Ill. 2d 556, 564, 413 N.E.2d 416, 420-21.) A sentencing judge may look at facts of the crime and may search anywhere within reasonable grounds for other facts which would tend to aggravate or mitigate the offense, without being

strictly bound by rules of evidence which apply to findings of guilt. *People v. Ramsey* (1975), 24 Ill. App. 3d 1038, 1041, 322 N.E.2d 547, 549.

■■ ■ Factors from which an appropriate sentence may be deduced include defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882, 884.) Other considerations include abnormal or subnormal tendencies, natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and something of his life, family, occupation, and criminal record. (*People v. Gaines* (1974), 21 Ill. App. 3d 839, 847, 316 N.E.2d 14, 21.) An important factor is the seriousness of defendant's crime. (*People v. Morgan* (1974), 59 Ill. 2d 276, 282, 319 N.E.2d 764, 768.) Moreover, sentencing is a matter of judicial discretion, and absent a showing of abuse of that discretion, the sentence of the trial court may not be altered upon review. *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.

Appellant argues that the letters to the court expressing outrage at its finding of not guilty on the murder charge and demanding the imposition of the maximum extended term violated his right to an impartial sentencing hearing. We disagree.

■ When considering a presentence report, the court must exercise care to insure the accuracy of the information considered and to shield itself from the potentially prejudicial effect of improper material. (*People v. Peacock* (1982), 109 Ill. App. 3d 684, 685-86, 440 N.E.2d 1260, 1262.) Here, the court shielded itself from the potentially prejudicial effect of the letters by its consideration of the letters "for what they [were] worth disregard[ing] general hearsay allegations of abuse."

■■ ■ Appellant additionally argues that the court considered unfounded accusations of wife abuse of the witnesses who testified during the aggravation hearing. Generally, when reviewing a bench trial, a court of review presumes that the judge considered only competent evidence. (*People v. White* (1980), 84 Ill. App. 3d 1044, 1049, 406 N.E.2d 7, 11.) As previously stated, the court announced that it would disregard hearsay allegations of abuse in the letters. Under these circumstances, we find that during the hearing in aggravation, the judge considered only competent evidence and disregarded any unfounded accusations of abuse.

■ Statutory authority provides that an extended-term sentence may be imposed when a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater

class felony when such conviction occurred within 10 years after the previous conviction excluding time spent in custody, and such charges are separately brought and tried and arise out of a different series of acts. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(1).) The presence of a single factor in section 5—5—3.2 is sufficient to support the imposition of an extended-term sentence. *People v. Ferguson* (1989), 132 Ill. 2d 86, 95.

Specifically, a second conviction of a Class 1 felony within 10 years is sufficient in itself to support an extended-term sentence. (*People v. Timmons* (1984), 127 Ill. App. 3d 679, 687, 469 N.E.2d 646, 652.) The crime of taking indecent liberties with a child is a Class 1 felony. (Ill. Rev. Stat. 1979, ch. 38, par. 11—4(e) (repealed July 1, 1984).) The extended-term range for voluntary manslaughter, a Class 1 felony, is from 15 to 30 years. (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—8—2(a)(3), 9—2(c).) Thus Heredia's 24-year sentence is within the statutory guidelines. When imposing the extended-term provisions, the court should look at the nature of the offense committed as well as the defendant's prior criminal record. (*People v. Sias* (1980), 91 Ill. App. 3d 1095, 1103, 415 N.E.2d 618, 624.) Here, the court articulated that the sentence was based upon the nature of the crime committed, the intentional firing of five gunshots after a heated argument, in addition to the prior crime of taking indecent liberties with a child, perpetrated against another family member, their child, Lisa. We find no abuse of discretion by the court's application of the extended-term sentencing provisions to the case at bar.

Heredia further contends that the court's findings during the sentencing hearing were inconsistent with the facts presented at trial. We disagree. The court weighed the aforementioned factors, including factors in mitigation, and considered the competent evidence presented at trial. We hold that the findings made during sentencing were consistent with the manifest weight of the evidence presented at trial and that the 24-year sentence was not an abuse of discretion.

Heredia argues that the court erred in finding him guilty of voluntary manslaughter because the State failed to negate his theory that the death was caused by either recklessness or accidentally. We disagree.

Voluntary manslaughter occurs when a person kills an individual without lawful justification when at the time of the killing he acts under a sudden and intense passion resulting from serious provocation by the person killed. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person. Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a).

 Our review of the record indicates that the trial court's ruling that Heredia's acts were intentional, not accidental or reckless, was proper and not against the manifest weight of the evidence. This is so particularly given the nature of the five gunshot wounds, Heredia's statement that he chased Laura, shot her, pulled her out of the closet and shot her again, and Lisa's testimony that she heard the opening and closing of the closet door, corroborating that Laura tried to escape his attack.

Lastly, Heredia argues that the court erred in allowing the admission of testimony regarding his alleged prior assault of his wife and conviction for taking indecent liberties with his daughter. We disagree.

During cross-examination of Heredia, the following questions were asked by the assistant State's Attorney and answered as follows:

"Q. During that period of time [1973-1978] did you ever physically abuse her [your wife]?

A. No.

Q. Did you in that period ever threaten your wife with a weapon?

A. No.

Q. Isn't it true that in 1977 you were arrested by the police for aggravated assault on a complaint signed by your wife?"

Defense counsel objected and the objection was sustained.

"Q. Do you recall being arrested in 1977?

A. Probably, but for aggravated assault?

Q. Did it concern a weapon?

A. I was arrested for what they call U.U.W. [unlawful use of a weapon].

Q. Did your wife sign a complaint?"

Defense counsel objected.

"A. I don't know. There was no charge. You want to go on with it?

Q. I will take it one step further. And the charges were subsequently dismissed in court. Isn't that correct?

A. A night in jail I guess if you want to look at it that way, yes. ***

Q. When you were arrested for that gun, your wife was the complaining witness, wasn't she?"

Defense counsel objected.

 Evidence of a defendant's prior misconduct may be admit-

ted, in an appropriate case, if it is offered for a purpose other than to show the defendant's propensity to commit crime. Specifically, evidence of a defendant's prior acts of violence toward a victim has been admitted as proof of the defendant's intent at the time of the commission of the offense charged. *People v. McCarthy* (1989), 132 Ill. 2d 331.

■■ We find these questions appropriate because they were relevant to Heredia's disposition toward and relationship with his wife. Heredia argued that his actions were accidental or reckless. His testimony depicts Laura's actions during the marriage and culminating on December 16 as just provocation for his actions. The testimony as to his violence toward her is relevant to a determination of whether her death was more likely the result of an accident or violence. Accordingly, we find that the probative value of this evidence outweighed any prejudicial effect.

On cross-examination, Heredia was asked why he left the home in May 1984 and responded that he had pled guilty to taking indecent liberties with his child. In May 1984 Heredia was sentenced to four years of probation for taking indecent liberties with his daughter during the time period when she was 9 to 11 years old.

The subject matter of the charge was elicited on direct examination and the parties stipulated to the admission of a certified copy of the conviction. In addition, we conclude that these family circumstances shed light on the tension between the decedent and Heredia as well as her reasons for asking him to leave the home. Thus, the evidence was properly admitted.

Accordingly, we affirm the conviction and sentence of the circuit court.

Affirmed.

FREEMAN, P.J., and CERDA, J., concur.