THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARIO A. GODINA, JR., Defendant-Appellant.

Third District   No. 3—90—0564

Opinion filed December 24, 1991.

Peter A. Carusona, of State Appellate Defender's Office, of Ottawa, for appellant.

Edward Burmila, Jr., State's Attorney, of Joliet (John X. Breslin and Jay Paul Hoffman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCUSKEY delivered the opinion of the court:

The defendant, Mario A. Godina, Jr., was convicted by a jury of the offense of second-degree murder. The defendant was sentenced to six years' imprisonment. He appeals. We reverse and remand for a new trial.

Mario A. Godina, Jr., Jose Rojas, Francisco Anguiano, and David Scroggins were all indicted for first-degree murder in the death of Denny Reyes. The indictment alleged that they killed Denny Reyes on February 21, 1990, without lawful justification by shooting him with a gun, knowing that such act created a strong probability of death or great bodily harm to Reyes. Godina was tried by a jury separately from the other indicted individuals.

This shooting was the result of a continuing gang conflict that exists in the Joliet area between the "Latin Kings," "Vice Lords" and "2-Sixers." Godina, Rojas and Anguiano were members of the 2-Sixers. The Latin Kings and Vice Lords are allies despite the fact that the Latin Kings are 90% Hispanic and the Vice Lords are 90% black.

The State called several eyewitnesses to testify. One of the witnesses was David Scroggins, who admitted his involvement in the shooting. About an hour and a half before the shooting, he went to Rojas' house, where he met Godina for the first time. Godina indicated that on the previous day, some members of the Vice Lords accosted him. Godina, Rojas and Scroggins drove around looking for the Vice Lords. When they saw some members of the Vice Lords, they threw gang signs and rocks at them. They continued driving until they saw some members of the Latin Kings. When they saw the Latin Kings, they chased them, threw gang signs at them, and Rojas fired the .32 caliber handgun at one of the Latin Kings.

Godina, Scroggins, and Rojas returned to Rojas' house in anticipation of the Latin Kings' arrival. Anguiano joined them there. Rojas brought out several weapons from his basement. Scroggins took a .38 revolver, Anguiano had a .25 handgun, Rojas took a .30-30 rifle, and Godina grabbed a .22 rifle.

Shortly thereafter, Scroggins noticed a group of approximately 15 people walking down Benton Street. This rival group consisted of members of the Latin Kings and the Vice Lords. Godina testified he heard a popping noise sounding like gun fire coming from the direction of this group. The rival group continued approaching, so the 2-Sixers started shooting at them. Rojas, Scroggins and Godina were in the street as they fired. Anguiano ran closer to the rival group before he fired. At this point, the rival group was about two blocks away. Scroggins did not see any members of the rival group holding any weapons. When the shooting started, the rival group in the street scattered. The shooting lasted for 10 to 15 seconds. The members of the 2-Sixers retreated to Rojas' basement. Godina exclaimed that he thought he struck a couple of Latin Kings.

Raymond Lopez, Reyes' cousin, testified that at the time of the shooting, he was in front of his own house at 209 Benton Street. When the shooting began, he ducked down to avoid gunfire, and upon looking up, he noticed Denny Reyes lying on the ground by the front door.

Antonia Lopez, Raymond's brother, who was with Raymond at the time of the incident, recalled that immediately prior to the shooting, 20 to 25 gang members were walking up Benton Street towards

Rojas' house. Rojas' house was located about two to three blocks from Lopez's residence. Antonia stated that there were five persons outside Rojas' house, all of whom appeared to be of Mexican or Hispanic descent. He did not recognize any of these five individuals. When Antonia heard the shots fired, he dropped to the ground. When he got up, he noticed Denny Reyes had been shot. Antonia said the shots came from far away.

Alejandro Torres testified he was walking alone on Benton Street behind the members of the gang at the time of the shooting. Torres stated he was not a member of any gang. He recollected that members of the gang were taunting the five Hispanic males. Upon hearing gunfire, he ducked behind a car until the shooting ceased. Torres knew Godina and the other defendants, but he he did not recall seeing them at this time or place.

Miguel Orozco testified next. He was a member of the Latin Kings. At the time of the shooting, he was walking on Benton Street with some of his fellow Latin Kings. Upon reaching the area near Rojas' house, he saw Godina and others who all appeared to be of Hispanic origin. He saw Rojas and Godina holding a rifle. As he heard gunfire, he looked up and saw Godina firing a rifle. He and the other Latin Kings then scattered.

The autopsy determined that Denny Reyes died from a head wound caused by a single high-velocity bullet. Metal fragments were recovered from the left side of his skull. The fatal wound did not resemble a wound caused by a .22, .25, or .38 caliber bullet. It was subsequently determined that the fatal bullet traveled approximately 125 feet prior to striking Reyes.

No fingerprints were removed from the guns or clips that were recovered, and Godina's hands were not tested for powder burns. It was undetermined if the spent bullets were discharged from the guns recovered or if the bullet found next to Reyes' body was fired from Godina's gun. Nor was it determined from which guns, if any, were discharged the copper-jacketed projectile and .22 projectiles recovered from the adjacent doorjamb. The bullet fragment recovered from under Reyes' body was determined unsuitable for comparison. Three bullet fragments recovered from the left side of Reyes' skull were mutilated, and no comparison was attempted.

Officer Horvath testified, over objection, that he learned Godina and Rojas had boarded a bus for St. Louis shortly after the incident. He further testified that Godina was arrested upon exiting the bus in St. Louis. Horvath traveled to St. Louis in order to bring Godina back to Joliet.

At the close of the State's case, Godina sought a directed verdict on the grounds that the State failed to prove he possessed the specific intent to murder Reyes. Godina also argued the State had failed to prove that the killing was not justified. Godina claimed that the theory of transferred intent did not apply to this situation since the indictment alleged the specific intent to murder Reyes, not someone else or another person whose identity was possibly unknown. Therefore, Godina asserted the State had failed to prove him guilty beyond a reasonable doubt of first-degree murder. The trial judge stated that since Godina and the others fired their guns after they heard a popping noise, they could have reasonably believed that they were being shot at by members of the Latin Kings and the Vice Lords. Therefore, Godina could have reasonably believed he was acting in self-defense. The court directed a verdict of acquittal as to first-degree murder and ordered the State to proceed on the charge of second-degree murder.

Godina moved for a directed verdict on second-degree murder arguing that since the State had failed to prove first-degree murder, the State, as a matter of law, failed to prove the elements of second-degree murder. The trial judge denied defendant's motion.

The jury returned a verdict of guilty as to second-degree murder. Godina moved for a new trial and alleged that Orozco, a material witness for the State, had a pending residential burglary charge which the State failed to disclose to the defense. The trial court ruled that any such error was harmless. Therefore, Godina's motion was denied. Godina also sought a judgment notwithstanding the verdict because he alleged that the continuation of the trial on second-degree murder violated double jeopardy. The trial court also denied that motion. Godina was then sentenced to six years' imprisonment.

Godina raises several issues on appeal. Godina contends that he was denied his constitutional right to due process because the State failed to disclose Orozco's pending residential burglary charge. The State responds as follows: (1) that it is not required to provide a defendant with information about pending charges filed against a material witness in a criminal case; (2) that it exercised due diligence in attempting to provide discovery including this information; and (3) that Godina was not prejudiced by the State's failure to disclose this information. The prosecutor claimed and the trial court found that the State's failure to disclose this information was a result of mere inadvertence. The prosecutor stated that she ran a computer check on the witnesses' juvenile and misdemeanor files under the name "Orazco." The prosecutor said that was the spelling of the name that appeared

in the police reports. The computer check did not reveal any pending charges against "Orazco." The prosecutor acknowledged that she failed to run a check using the correct spelling of Orozco's name.

■ Supreme Court Rule 412(c) provides: "[T]he State shall disclose to defense counsel any material or information within its possession or control which tends to negate the guilt of the accused *** or would tend to reduce the punishment therefor." (134 Ill. 2d R. 412(c).) Good or bad faith of the prosecutor relative to disclosing discoverable items and facts is unimportant and irrelevant. (*Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) Due process requires the State disclose to an accused, upon request, evidence that is material to the guilt or punishment of a witness. (*Brady v. Maryland*, 373 U.S. at 86, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196.) Once a trial court determines that a discovery violation has occurred, the court may order further discovery, grant a continuance, exclude the evidence, or impose any sanction which, in its discretion, it deems just under the circumstances. (134 Ill. 2d R. 415(g).) The State claims that Orozco's pending felony charge of residential burglary was not material, and therefore, not subject to disclosure under *Brady*. We disagree. Orozco was a material witness for the State, and his testimony assisted the State in its conviction of the defendant. A defendant has a right to cross-examine and otherwise inquire of a witness concerning pending criminal charges. (*Delaware v. Van Arsdall* (1986), 475 U.S. 673, 89 L. Ed. 2d 674, 106 S. Ct. 1431; *People v. Tonkin* (1986), 142 Ill. App. 3d 802, 492 N.E.2d 596.) In resolving this issue, the court should review the entire record and consider any adverse effect the prosecutor's nondisclosure would have on the preparation and presentation of the defendant's case. (*People v. Gutirrez* (1990), 205 Ill. App. 3d 231, 564 N.E.2d 850.) There are a number of important ways that the defense could have utilized this information in preparing and presenting their case. For instance, Orozco was facing the charge of residential burglary, which is a Class 1 felony. (Ill. Rev. Stat. 1989, ch. 38, par. 19—3.) A person convicted of residential burglary faces a mandatory term of imprisonment of 4 to 15 years. (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—8—1(a)(4), 1005—5—3(c)(2)(F).) Orozco would be highly motivated to assist and cooperate with the prosecution of Godina in order to receive leniency from the State with respect to the residential burglary offense filed against him. The defense certainly would utilize this information in the cross-examination of Orozco's testimony and to possibly characterize it to the jury as being self-serving, exaggerated, or inaccurate. However, it is not the function of the court to speculate as to exactly how Godina would have utilized this

information or what additional evidence it may have revealed had it been disclosed. (*People v. Dixon* (1974), 19 Ill. App. 3d 683, 312 N.E.2d 390.) However, it is certain that if Godina would have received this information prior to trial, he would have had the opportunity to review and utilize it in the preparation and presentation of his defense. Therefore, we reverse and remand for a new trial based on this issue.

In *Giglio v. United States* (1972), 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763, the Court held that the trial court erred in denying defendant's post-trial motion for a new trial based on a similar issue even though the prosecutor was not aware that the witness was offered immunity for his testimony. Generally, a reviewing court will not reverse the trial court's exercise of discretion in granting a particular sanction in the absence of a showing of surprise or prejudice to the defendant. (*People v. Loggins* (1985), 134 Ill. App. 3d 684, 480 N.E.2d 1293.) Due to the sensitive nature of this information and the unknown effect on the jury if it had been disclosed, Godina was prejudiced because he was denied the full opportunity to prepare his defense and make necessary tactical decisions with the aid of this information. See *People v. Aguilar* (1991), 218 Ill. App. 3d 1, 578 N.E.2d 109.

■ Godina next argues on appeal that he was denied a fair trial because the State introduced prejudicial hearsay testimony from Officer Horvath. Horvath testified that he was informed Godina left the Joliet area following the shooting. Godina claims that the State offered this testimony only for a limited purpose. That purpose was to explain why Horvath did not request the St. Louis police to conduct a scientific test of Godina to determine if he had recently fired a gun. Godina maintains that further prejudice occurred during the prosecution's closing argument when the prosecutor misused this evidence. The prosecutor inferred that Godina's flight from Joliet after the shooting exhibited his guilt. We agree with the defense that Godina was prejudiced by the introduction of this hearsay testimony.

During direct and cross-examination of Horvath, he stated he went to St. Louis for the purpose of retrieving Godina, who was in custody. Godina objected several times during Ms. Bertani's redirect examination of Horvath to the introduction by the prosecution of the following hearsay testimony:

> "Q. And you, in the meantime, you received information that the Defendant, Mario Godina, was in Chicago at one time before he went to St. Louis, is that correct?
> MR. LENARD: Objection.

THE COURT: Read back the question. (Whereupon, the record was read.)

THE COURT: That will be overruled. You may answer.

MS. BERTANI: Thank you. Did you, at one time, before you went to St. Louis that next day, almost 21 hours later, receive information that Mario Godina was in Chicago at one time?

THE WITNESS: Yes.

MS. BERTANI: You learned that he was in a Greyhound Bus Station?

A. Yes.

Q. You received information he was on a bus travelling to St. Louis?

MR. LENARD: I object to this.

THE COURT: I'm afraid not, Mr. Lenard. She's asking for the time, and I think you know why.

MR. LENARD: She's asking leading questions, Judge.

THE COURT: I don't think they are leading. Objection overruled. Go ahead.

MS. BERTANI: Detective, you knew before you went to St. Louis that Mario Godina was on a Greyhound bus, correct?

A. Correct.

* * *

Q. And, in fact, you contacted the St. Louis authorities to check on the Greyhound bus from Chicago to St. Louis to see if Mario Godina was on there?

A. I did not.

Q. One of the Officers went with you?

A. Correct.

Q. You had been contacted that Jose Rojas was on the bus?

A. Yes.

Q. They were stopped by the St. Louis Police Department on the Greyhound Bus—At the Greyhound Bus Station?

A. Yes."

The defense contends that the testimony of Horvath was offered by the State only for the limited nonhearsay purpose of showing why Horvath did not request that Godina's hands be tested to determine whether he had recently fired a gun. In other words, during redirect examination, the prosecutor attempted to bolster her case by encouraging Horvath to explain why he failed to request that Godina's hands be tested.

However, during closing argument, the prosecutor, over several objections, went a step further and argued the substantive value of this evidence. Specifically, she inferred that Godina's flight to St. Louis exhibited guilt.

She commented as follows:

"Another thing I'd like you to look at, ladies and gentlemen, when you deliberate, you've heard evidence that the defendant was arrested in Saint Louis, Missouri, with Pepe Rojas.

MR. LENARD: Objection, Judge, that is not the evidence.

THE COURT: Approach the bench. (WHEREUPON A CONFERENCE WAS HELD AT THE BENCH.

THE COURT: The objection overruled.

MR. LENARD: Thank you, Judge.

THE COURT: You may proceed.

MS. BERTANI: Thank you, your Honor. Ladies and gentlemen, I want you to consider this: The defendant, as I said, was arrested in Saint Louis, Missouri, with Pepe Rojas. Look at that action, itself. Denny Reyes is killed. They jump on a Greyhound bus—

MR. LENARD: Objection, Judge, there's no testimony of that in this case.

THE COURT: Approach the bench. (WHEREUPON A CONFERENCE WAS HELD AT THE BENCH.)

THE COURT: The objection overruled.

MR. LENARD: Thank you, Judge.

MS. BERTANI: May I proceed, your Honor?

THE COURT: Proceed.

MS. BERTANI: Mario Godina and Pepe Rojas were arrested in Saint Louis, Missouri. Think about those acts. They jump on a Greyhound bus from Chicago on their way to Saint Louis, and they get stopped and arrested. Even though at that time the police didn't know who was responsible, what kind of gun that killed Denny Reyes, what kind of bullet killed Denny Reyes, Mario Godina took off and he left the State. Now, doesn't that tell you that he, in his mind, knew it didn't matter who hit him?

MR. LENARD: Objection to what went on in his mind, Judge.

THE COURT: The State can argue, as you can, Mr. Lenard, the inferences from the evidence in the case. The jury will decide whether or not to accept those arguments or those inferences.

MR. LENARD: Thank you, Judge.

THE COURT: Objection overruled.

MS. BERTANI: May I again proceed, your Honor?

THE COURT: You may proceed.

MS. BERTANI: Doesn't that tell you, if you think about it, that even though Mario Godina, Pepe Rojas didn't know which bullet killed that little boy, he knew that he was just as responsible as whoever did it; why else leave? It's conscientiousness of guilt that demonstrates a whole lot in this case, ladies and gentlemen."

Initially, it was error to allow Horvath to testify that Godina boarded a bus in Chicago and was arrested in St. Louis because it was hearsay. (*People v. Lopez* (1987), 152 Ill. App. 3d 667, 504 N.E.2d 862.) Hearsay statements are generally inadmissible because the party against whom they are offered has no opportunity to test the credibility of the declarant by cross-examining the declarant. (*People v. Parrott* (1976), 40 Ill. App. 3d 328, 352 N.E.2d 299.) An exception to this rule is when out-of-court conversations are offered to demonstrate and explain certain police procedures or the lack of such, *e.g.*, paraffin testing. (*People v. Sanders* (1980), 80 Ill. App. 3d 809, 400 N.E.2d 468.) Horvath should have only been allowed to testify to the limited nonhearsay statements that he did not test or request that Godina's hands be tested. It was prejudicial error for the prosecutor to argue the substantive value of the hearsay evidence to the jury. (*People v. Johnson* (1990), 202 Ill. App. 3d 417, 559 N.E.2d 1041.) It was additional prejudicial error for the prosecutor to infer Godina's guilt by flight. (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659.) If a prosecutor takes improper advantage of the admissibility of evidence by offering it for a limited purpose, and once it is admitted, makes impermissible use of it during closing argument, that impermissible use will be deemed flagrant and grounds for reversal. (*People v. Campbell* (1983), 115 Ill. App. 3d 631, 450 N.E.2d 1318.) Additionally, the jury's consideration of Godina's guilt by flight could have affected its ultimate decision that Godina was not justified in defending himself by shooting at the rival gang. (*People v. Kneller* (1980), 83 Ill. App. 3d 325, 403 N.E.2d 1252.) Ultimately, the issue of whether Godina's belief that he acted in self-defense was reasonable or unreasonable should have been decided by the jury based solely on competent evidence. Furthermore, the hearsay testimony concerning Godina's flight, coupled with the prosecutor's improper inference of guilt based upon that hearsay testimony, was the glue that bonded together all the circumstantial evidence in this case. We find the prosecutor's im-

proper use of Horvath's hearsay testimony during closing argument denied Godina a fair trial.

■ Godina next contends that because the trial court directed a verdict of acquittal as to first-degree murder, the trial court thereafter erred in allowing this case to proceed to verdict on second-degree murder. Godina claims the trial court's ruling violated the principles of double jeopardy. Godina contends the trial judge ruled that Godina's belief he was acting in self-defense was reasonable. Therefore, Godina alleges that he had a viable affirmative defense of self-defense which constituted lawful justification for second-degree murder. (Ill. Rev. Stat. 1989, ch. 38, pars. 3—2, 7—1.) Once the State proves the elements of first-degree murder, it is the defendant's burden to show, by a preponderance of evidence, that a mitigating factor exists. (Ill. Rev. Stat. 1989, ch. 38, par. 9—2(c).) However, a review of the record clearly reveals the trial judge did *not* say that Godina reasonably acted in self-defense. Instead, the trial judge stated that Godina and his companions "could reasonably have believed that they were acting in self defense." In sum, the trial court determined that the prosecution had met its burden as to second-degree murder by showing that an unjustified killing occurred, and that Godina reasonably believed he was acting in self-defense when he took part in the acts which led to Reyes' death. The trial judge left it up to the jury to determine whether Godina's actions in self-defense were reasonable or otherwise unreasonable. Regardless of how the jury decided that issue, its ultimate determination would not have resulted in an inconsistent verdict. A verdict of guilty of voluntary manslaughter (predecessor to second-degree murder) and not guilty of murder is not inconsistent. *People v. Bridges* (1989), 188 Ill. App. 3d 155, 544 N.E.2d 40.

■ Finally, Godina contends that his conviction should be reversed because the indictment specifically alleged that he shot at Reyes and knew that such act created the strong probability of death or bodily harm to Reyes. Godina claims the evidence revealed that he did not intend to harm Reyes. Therefore, he claims he was prosecuted on the theory of transferred intent, which could not support his conviction for second-degree murder. The indictment specifically stated "[he] without lawful justification killed Denny Reyes by shooting Denny Reyes with a gun, knowing that said act created a strong probability of death or great bodily harm to Denny Reyes." The law in this State is well settled that where a person shoots at one and in the direction of another, with intent to kill, but kills or injures the other, he may be convicted of the crime of murder or the attempted murder

of the unintended victim. *People v. Marshall* (1947), 398 Ill. 256, 263, 75 N.E.2d 310.

Initially, this issue is resolved by looking at the sufficiency of the indictment. The purpose of an indictment is to advise the accused of the nature of the charge so that he is adequately able to prepare his own defense. In order to vitiate a conviction based on a faulty indictment, there must be a variance between the allegations in the charging instrument and the proof at trial. The variance must be material and of such character as to mislead the defendant in preparing his defense or expose him to double jeopardy. (*People v. Davis* (1980), 82 Ill. 2d 534, 413 N.E.2d 413.) Otherwise, if the charge is submitted in writing, and states (1) the name of the offense; (2) the statutory provision allegedly violated; (3) the name of the accused; (4) the date and county of the offense; and (5) sets forth the nature and elements of the offense, the indictment should not be dismissed nor will the conviction based on the indictment be reversed on that ground. (*People v. Simon* (1980), 91 Ill. App. 3d 667, 416 N.E.2d 285.) A variance between the allegations of an indictment and the evidence presented at trial is not always fatal. If a defendant is sufficiently apprised of the charges filed against him, the convictions may be sustained. In *People v. Alexander* (1982), 93 Ill. 2d 73, 442 N.E.2d 887, the indictment alleged the wrong date of the crime; in *People v. Sui Wing Eng* (1985), 138 Ill. App. 3d 281, 485 N.E.2d 1222, it alleged the wrong location of the crime; in *People v. Long* (1978), 65 Ill. App. 3d 21, 382 N.E.2d 327, the defendant who was indicted as principal was actually an accessory to the crime; and in *People v. Forrest* (1971), 133 Ill. App. 2d 70, 272 N.E.2d 813, the defendant was indicted for murdering the victim; however, the defendant actually shot at a different object or subject.

With regard to the variance in the indictment in the present appeal, we find Godina was sufficiently apprised of the offense he allegedly committed. Our review of the indictment shows that Godina should have been able to adequately prepare his defense based on the facts alleged in the indictment.

For the reasons indicated herein, the circuit court of Will County is reversed, and this cause is remanded to the circuit court for a new trial consistent with the directions contained herein.

Reversed and remanded.

STOUDER, P.J., and SLATER, J., concur.