THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RAYMOND A. SMITH, Defendant-Appellant.

Third District    No. 3—92—0459

Opinion filed February 2, 1994.

Larry R. Wells, of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Joseph Navarro, State's Attorney, of Ottawa (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE SLATER delivered the opinion of the court:

Defendant Raymond Smith was convicted of two counts of armed robbery and was sentenced to a term of life imprisonment under the Habitual Criminal Act. (Ill. Rev. Stat. 1991, ch. 38, par. 33B—1.) On appeal, defendant contends: (1) that he was denied a fair trial because his cross-examination of a witness was improperly limited and because the trial court erred in permitting the State to present hearsay evidence; (2) that he was denied a fair trial by acts of prosecutorial misconduct during closing argument; and (3) that the Habitual Criminal Act is unconstitutional. We reverse and remand.

At the jury trial on March 2, 1992, Ruth Teter testified that she was invited to be a judge in the Miss Ottawa beauty pageant in Ottawa, Illinois. There was a competition on Saturday evening, and on Sunday morning, July 29, 1990, Teter and another judge, Lola Hacker, went to the motel coffee shop and had breakfast. At 8:45 a.m. they started to go back to their adjoining rooms. As they were walking down the hall, a man walked toward them, then stopped, acted as if he had forgotten something, and went in the opposite direction. Teter and Hacker went to their adjoining rooms. As Teter was in her room she looked into Hacker's room through a door that joined them. Hacker pointed behind her and Teter turned and saw a man bending over her bag which was sitting on the closet floor. She asked the man what he was doing and he shut the door and displayed a handgun. The man told Teter that he wanted her money. Teter thought that he was the same man that had been in the hall. She got her wallet from the bed and the man took $75 from the wallet. The man also took money from Hacker's wallet. The man told Teter and Hacker to go into the bathroom and lock the door. After some time, the women came out of the bathroom and called the police. Teter identified the defendant as the man who had robbed her. When asked how sure she was about her identification she replied, "I'm positive. Absolutely."

In February of 1991, Investigator Greg Elliott showed Teter six photographs from which she selected the defendant's photograph as the man who had robbed her. Teter testified that at the time of the armed robbery the defendant was clean shaven while at the time of

trial he had a beard. In addition, defendant appeared to be heavier at trial than when he had committed the robbery. Teter admitted that she had described the man who robbed her to police as being about 30 years old and weighing 160 pounds. She also admitted that she told the police the man was clean shaven and had a thin face. The man had been wearing a baseball cap and wrap-around sunglasses. Teter did not notice any tattoos on the man's hands, nor did she see a cast on his hand. Teter agreed that she told police that she had chosen the defendant's photograph because of the shape of the lower part of the face, the lines around the nose and mouth and the fact that the face was thin.

Lola Hacker testified that she was also a pageant judge on July 29, 1990. She and Ruth Teter were staying at the Ottawa Inn in adjoining rooms. After breakfast they went back to their rooms and passed a man in a hallway. After she got in her room, Hacker looked through the adjoining door and saw a man going through Teter's bag. Teter asked the man what he was doing, and he drew a gun and closed the door. He told them he wanted their money and he took money from Teter and $65 from Hacker. The man told them to go in the bathroom and lock the door. After some time, the women came out and the police were called. Hacker identified the defendant in court as the robber, and she stated that she was absolutely sure of her identification. Hacker admitted, however, that when she was shown a group of photographs in February of 1991, she did not select defendant's photograph, but instead identified a different person as the man who had robbed her. Hacker said that she should not have chosen any photograph at the photographic array because she "wasn't sure enough." She thought the photographs were too small for her to be sure. Nevertheless, she did pick photograph number four as being the photograph of the robber. Photograph number three was the photograph of the defendant, and in court Hacker identified photograph three as the photograph of the robber. Hacker believed that at the time of the robbery the defendant was clean shaven and thinner than he was at trial. The description she gave the police was of a black male, 160 pounds, in his thirties. She did not recall seeing any tattoos. She believed the man had a thin face and was a thin man.

Greg Elliott, an investigator for the Ottawa police department, testified that he investigated the armed robbery at the Ottawa Inn. Various items were sent to the crime lab for fingerprint processing. Based on a report from the crime lab and the Automated Fingerprint Identification System (AFIS), Elliott focused his investigation on the defendant. Elliott obtained a photograph of defendant, put that

photograph in a photographic array, and met the complaining witnesses at Ruth Teter's house in Elgin. Teter picked the defendant's photograph, but Lola Hacker picked another man. People's exhibit 1, which was photograph three in the array, was taken August 27, 1990, less than one month after the robbery. It showed that the defendant was wearing a goatee and a mustache at that time. On October 6, 1991, the defendant weighed 210 pounds and was 5 feet 10 inches tall.

Elliott testified that at the time of the photographic array, Hacker told him that she was not sure if she could identify the robber from the photographs, because all she could distinctly remember was his height and his voice. Hacker told Elliott that she had picked photograph number four, that of a man named Armen Moore, because of the shape of his mouth and his face. Armen Moore was about 30 years old, while the defendant was 40 years old in July of 1990.

Mary McCarthy, a fingerprint examiner for the Illinois State Police, testified that she found a latent fingerprint on a patent leather purse taken from the robbery scene. She sent the fingerprint to the AFIS computer identification system, and it returned the defendant's name as a possible match. McCarthy compared the fingerprint on the purse to the defendant's fingerprints and, in her opinion, they were the same. McCarthy was then asked by the prosecutor, "[D]id you have your conclusion checked?" She answered, "Yes. My identification was verified by another fingerprint examiner." Defense counsel objected and asked that the answer be stricken "unless that person testifies." The objection was overruled. The witness then testified that Lauren Wicevic was the other fingerprint examiner who checked the accuracy of her work. Defense counsel's hearsay objection was overruled.

After the State rested its case, the defendant called Officer William Licht, a patrolman for the Ottawa police department. Officer Licht testified that Teter and Hacker were very upset when he arrived on the scene to investigate the armed robbery. They agreed that the robber was a black male about 30 years old, 5 feet 9 inches tall, 160 pounds, with black hair and wearing sunglasses.

Bernard Young, the defendant's brother, testified that on June 29, 1990, the defendant was living with their mother, Bessie Young, on Washington Boulevard in Chicago. There was to be a barbecue that afternoon, and Young had agreed to fix a car belonging to another brother, Doug Young. Bernard Young got to his mother's house between 8:30 and 9 a.m. When he got there, his mother, his father, Doug and the defendant were all there. In addition, James Brown,

Gerald Stacey and a few other people were there. They worked together to put a new transmission in Doug's car.

Bernard Young further testified that his mother's house is approximately 90 miles from Ottawa. Young remembered the date because his wife's birthday was 10 days after that day, and a family reunion was scheduled one day after his wife's birthday. According to Young, in July of 1990 the defendant weighed 210 pounds and had a goatee and a mustache just like he was wearing at trial, and he had it for at least 15 years. In addition, defendant had broken his left hand and was wearing a cast on that day. Defendant also has a tattoo on his right hand which says "love."

Bessie Young, the defendant's mother, testified that on July 29, 1990, the defendant was living at her home in Chicago. There was a family reunion set for the first Saturday in August, so the last Sunday in July was a day for lots of family to start gathering around. She woke the defendant up at 6 a.m. and saw him again near the garage at 9 a.m. When she returned from church around 1 p.m. the defendant was still there, working on a car. Between two and three dozen people were present that day at her home, including five of the defendant's sisters and their families. According to Bessie Young, the defendant has had a mustache since he was 18 years old. The defendant weighed 200 pounds and had a cast on his left hand on July 29, 1990. The defendant has a tattoo of the word "love" on his right hand.

Following closing arguments, the jury retired to deliberate at 11:25 a.m. At 2 p.m. they sent out a note, asking if they were allowed to have excerpts of the testimony presented at trial. They were told that they had received all the evidence. At 3:45 p.m. the jury sent out a note asking for scotch tape and a magnifying glass. This request was denied. At 5 p.m. the jury sent out a note that they were deadlocked, and by agreement the *Prim* instructions were given, and the jury retired again at 5:50 p.m. At 6:45 p.m. the jury sent out a note which read: "Can we refer to the record as to Lori Wescowic [*sic*] the assitant [*sic*] to Miss McCarthy [?] *** [W]as the initial LW [*sic*] in fact Lori Wescowic [*sic*][?] Was she the consulting analyst[?]" The jury were told that they would not be given any further evidence.

A supplemental record was made of additional jury notes. At some point the jury had asked: "(1) We would like to know what the testimony was on Ray's face hair was. [*sic*] From Bernard Young and Ray's mother from the record"; "(2) Where was the tatoo [*sic*] on Ray's hand[?]"; and "(3) Was there any evidence showing that Ray had a cast on his arm, if so why wasn't it submitted?" The jury were told that they had heard the evidence and would be given nothing

further. At 9 p.m. the jury returned guilty verdicts on both counts of armed robbery. Defendant's post-trial motion was denied and he was adjudged an habitual criminal and sentenced to a term of life imprisonment.

Defendant first contends that Mary McCarthy's testimony that Lauren Wicevic verified her fingerprint identification was inadmissible hearsay. Defendant maintains that this error was compounded when the prosecutor argued the hearsay corroboration attributed to Wicevic as substantive evidence to the jury and when he further argued that if McCarthy was mistaken in her identification then the defendant could have called Wicevic to rebut McCarthy's testimony. Defendant also points to the jury's request for scotch tape and a magnifying glass and the note referring to Wicevic as the "consulting analyst" as evidence of the jury's uncertainty regarding McCarthy's fingerprint identification.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. (*People v. Lawler* (1991), 142 Ill. 2d 548, 568 N.E.2d 895; *People v. Lopez* (1987), 152 Ill. App. 3d 667, 504 N.E.2d 862.) Such testimony is generally inadmissible, with limited exceptions, because of the inability to cross-examine the declarant. (*People v. Godina* (1991), 223 Ill. App. 3d 205, 584 N.E.2d 523.) Testimony by a witness that a nontestifying party identified the accused as the perpetrator of a crime is inadmissible hearsay. *Lopez*, 152 Ill. App. 3d 667, 504 N.E.2d 862.

■ The testimony of Mary McCarthy in this case that Lauren Wicevic verified her fingerprint identification was clearly hearsay. Wicevic's opinion was an out-of-court statement and it was offered to prove the truth of the matter asserted—that the fingerprint found at the scene of the crime was left by the defendant. The State contends, however, that the admission of hearsay identification testimony constitutes reversible error only where it is used as a substitute for courtroom identification or when introduced to strengthen and corroborate a weak identification. (*People v. Sias* (1980), 91 Ill. App. 3d 1095, 415 N.E.2d 618.) Such evidence is harmless error when it is merely cumulative or is supported by a positive identification and other corroborative circumstances. (*People v. Mitchell* (1990), 200 Ill. App. 3d 969, 558 N.E.2d 559.) In addition, the erroneous admission of hearsay evidence is harmless if there is no reasonable possibility that the verdict would have been different if the hearsay had been excluded. (*People v. McCoy* (1992), 238 Ill. App. 3d 240, 606 N.E.2d 245.) The State argues that McCarthy's testimony regarding Wicevic's identification was merely cumulative of McCarthy's own testimony. Moreover, the State maintains that the evidence of defendant's guilt

is overwhelming in view of the positive identification of the defendant by both Ruth Teter and Lola Hacker. We disagree.

First, while Teter and Hacker identified the defendant at trial as the man who had robbed them, Hacker's prior misidentification weakened her credibility. In addition, there were significant discrepancies between the description of the robber given by Teter and Hacker to the police shortly after the robbery and the defendant's physical appearance at trial. Such matters are, of course, the province of the jury. We mention them only to illustrate that the evidence of defendant's guilt was not as overwhelming as the State suggests.

Second, we do not believe that the testimony regarding Wicevic's identification was merely cumulative of McCarthy's testimony. It is evident from the jury's notes that they were acutely interested in the fingerprint evidence in general and in Wicevic's "testimony" in particular.

Finally, the prosecutor compounded the effect of the improper hearsay testimony by emphasizing it during closing argument. The prosecutor stated:

"MR. ALVARADO [Assistant State's Attorney]: But the thing is Mary McCarthy testified in this case that her work was checked by a Lauren Wicevic, another fingerprint examiner in the office. Now, if there is some mistake here, if Mary McCarthy was mistaken about her analysis, the defendant could certainly have called Lauren Wicevic in here to say that there was a mistake."

It is prejudicial error for a prosecutor to argue the substantive value of hearsay evidence to the jury. (*Godina*, 223 Ill. App. 3d 205, 584 N.E.2d 523; see also *People v. Sommerville* (1990), 193 Ill. App. 3d 161, 549 N.E.2d 1315.) The first sentence of the comment related above violated this rule and improperly bolstered McCarthy's testimony. Worse still, the prosecutor then cast blame on the defendant for not rebutting McCarthy's testimony by calling Wicevic. This was error in two respects. First, the State may not comment on a defendant's failure to call a nonalibi witness to testify when the comment implies that the testimony would have been unfavorable to defendant and when the witness was equally accessible to the State. (*People v. Enoch* (1989), 189 Ill. App. 3d 535, 545 N.E.2d 429; *People v. Lasley* (1987), 158 Ill. App. 3d 614, 511 N.E.2d 661.) Second, nowhere in the discovery materials contained in the record is Wicevic listed as a witness or otherwise identified by the State. To chastise the defendant for failing to call a witness under the State's control when that witness' existence was apparently never revealed to the defendant borders on outrageousness. Although the trial court sustained

defendant's objection and instructed the jury to disregard the prosecutor's statement, under the circumstances we find that defendant was prejudiced by the prosecutor's remarks.

In summary, we find that the hearsay testimony improperly bolstered McCarthy's testimony, was presented as substantive evidence of defendant's guilt, and resulted in manifest prejudice. The prejudicial effect was exacerbated by the prosecutor's closing argument. These errors denied the defendant a fair trial and created a reasonable possibility that the verdict would have been different if they had not occurred. We therefore reverse defendant's convictions and remand for a new trial. In view of our disposition of this case, we will only briefly discuss defendant's additional claims of error.

Defendant next contends that the trial court erred in sustaining an objection to a question posed by defense counsel during cross-examination of Mary McCarthy. After McCarthy agreed that scientific tests are affected by the procedures used and the ability of the examiner, counsel asked:

"Q. Isn't it true that at times there are mistakes in the handling, classification and analysis of scientific samples in laboratories?"

The State objected on the grounds that, as posed, the question called for speculation and was irrelevant. The court agreed, stating:

"THE COURT: I'm going to sustain the objection on the basis that unless you can relate the question to possible mistakes or probable mistakes or any mistakes that might exist with regard to this particular examination, it is not relevant."

■ Rulings involving the scope of cross-examination lie within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Franklin* (1990), 135 Ill. 2d 78, 552 N.E.2d 743.) Testimony may be excluded as irrelevant because it is remote, uncertain or conjectural (see *People v. Schuldt* (1991), 217 Ill. App. 3d 534, 577 N.E.2d 870), and the trial court's decision concerning relevance and admissibility will not be disturbed absent a clear abuse of discretion (*People v. Hayes* (1990), 139 Ill. 2d 89, 564 N.E.2d 803). While defense counsel's question was not completely irrelevant, it was framed so generally that its probative value was insignificant. We find no error.

■ Defendant next contends that he was denied a fair trial by numerous instances of prosecutorial misconduct which occurred during closing argument. We have reviewed each of the allegedly improper remarks and we find that some of them have been waived, some were cured when the trial court sustained defense counsel's objections, and others were not error. We find that the verdict would

not have been different if any of these purported errors in closing argument had not been made.

■ Finally, defendant contends that the Habitual Criminal Act (Ill. Rev. Stat. 1991, ch. 38, par. 33B—1) is unconstitutional. Although we need not decide this issue in light of our reversal of defendant's conviction, we note that each of defendant's arguments has been rejected in prior cases. See *People v. Westefer* (1988), 169 Ill. App. 3d 59, 522 N.E.2d 1381 (and cases cited therein); see also *People v. Franzen* (1989), 183 Ill. App. 3d 1051, 540 N.E.2d 548; *People v. Glover* (1988), 173 Ill. App. 3d 678, 527 N.E.2d 968.

For the reasons stated above, the judgment of the circuit court is reversed and this cause is remanded for a new trial.

Reversed and remanded.

LYTTON and STOUDER, JJ., concur.