THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VERNETTA CASSELL, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CURLEE SIMMONS, Defendant-Appellant.

First District (5th Division) Nos. 1—94—2782, 1—95—1380 cons.

Opinion filed August 9, 1996.—Rehearing denied September 11, 1996.

Rita A. Fry, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant Vernetta Cassell.

Steven A. Greenberg, of Chicago, for appellant Curlee Simmons.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon, Nichelle L. Jenkins, Alan J. Spellberg, and Mark R. Gerhardt, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

The case involves the consolidated appeals of Curlee Simmons and Vernetta Cassell. Following a bench trial, defendant Simmons was found guilty of aggravated criminal sexual assault, home invasion and aggravated kidnapping and sentenced to three consecutive 15-year terms of imprisonment. Defendant Cassell was found guilty of aggravated criminal sexual assault and was sentenced to three consecutive six-year terms of imprisonment. We affirm the convictions of both defendants.

At trial, the victim, C.G., attempted to assert her fifth amendment privilege not to testify. The trial court denied C.G.'s request but granted the State's request to treat C.G. as a hostile witness. C.G. testified that on December 8, 1992, she was living in a third-floor apartment at 1606 West Albion in Chicago with her boyfriend, Curlee Simmons. That evening, she was at her downstairs neighbor's apartment when Simmons pushed the door open, entered her neighbor's bedroom, and asked C.G. if she would talk to him. Simmons pulled C.G. outside and told C.G. to get in the car. C.G. lost one shoe as Simmons was pulling her. C.G. and Simmons went into the front seat of the car. Simmons sat in the passenger's seat and C.G. sat on the floor near the passenger's seat. Vernetta Cassell was in the driver's seat of

the car. Cassell drove while Simmons and Cassell hit C.G. in the face. Simmons said that he was sorry he hit C.G. and that he was "not really going to hurt" her. Simmons then pulled C.G. into the back seat and punched and hit C.G. on her face, chest and arm. C.G. and Simmons then had sexual intercourse, and Simmons penetrated her both vaginally and orally. Simmons also put his fingers in C.G.'s vagina and her anus. C.G. testified that Cassell eventually stopped the car and C.G. got out of the car with Simmons. C.G. was not wearing a jacket or shoes. C.G. said that she was cold, and Simmons gave her his coat and said that he was sorry for "everything." C.G. ran from Simmons and knocked on the door of the first house she passed.

The police arrived soon thereafter and arrested Simmons. C.G. was taken to the hospital, where she was treated for scratches on her hands, bites on her hands, arms and chest, and a bruised and bloodshot eye. Her nose, mouth and eye were swollen.

C.G. admitted that she had told detectives that when Simmons pushed his way into her neighbor's apartment, she thought he had a gun in his inner coat pocket. She had also told the detectives that, after Simmons dragged her to the car, he said that if C.G. did not shut up, he was going to kill her. Cassell told her that "if [she] told anyone, she would kill [her]." C.G. also told the detectives that Simmons had put an unknown object as well as his fingers in her anus. She also told the detectives that she was forced into having vaginal intercourse with Simmons. C.G. testified that, at some point, Simmons got out of the car and left C.G. with Cassell. C.G. locked the car doors and told Cassell to drive away and not let Simmons back into the car. Cassell said she would not do that to Simmons. Simmons then got back into the car and he cursed C.G. and hit her. C.G. admitted telling detectives that when she exited the car with Simmons, he tried to force her into a vacant lot and told her that he was going to kill her. She also told detectives that when she ran away from Simmons and started banging on the door to a house, Simmons beat her and tried to drag her away from the door.

C.G. testified on cross-examination that while she did not at first consent to vaginal intercourse or oral sex with Simmons, she did later consent. However, she never consented to the penetration of her anus. C.G. testified that during the course of her relationship with Simmons, they would have arguments in which Simmons would strike her and, afterwards, they would have sexual relations. C.G. also testified that she hit Simmons in the car and he hit her back. While she was initially reluctant to get into the car with Simmons, she eventually agreed to enter the car. She never told Simmons to stop having sex with her. C.G. testified that Cassell said that C.G.

had lied to her about Simmons and Cassell then hit C.G. in the face several times.

Carol Severin, a registered nurse at Loretto Hospital, testified that she treated C.G. in the emergency room at 3 a.m. on December 9, 1992. C.G. was sobbing when she told Severin that her ex-boyfriend broke into her neighbor's apartment, pulled her outside by her hair and dragged her into a car that a female was driving. The ex-boyfriend hit her on her head and body. C.G. also told Severin that her ex-boyfriend forced her to have oral sex, vaginal sex, and then he inserted something into her rectum. Severin noticed that C.G. had a swollen eye, multiple abrasions under her eyes, a hemorrhage in the intercanular of her left eye, a large contusion on the midpariental area of the head, a swollen lip, a swollen nose and dried blood in both nares.

Officer Joseph Vandenbranden testified that while on patrol on December 8, 1992, he was flagged down by two young girls and learned that C.G. had been taken by Simmons at gunpoint from an apartment at 1606 West Albion. Officer Vandenbranden observed that the door to the first-floor apartment was open, the door frame was in pieces on the floor, and a shoe print was in the middle of the door.

Officer Latonia Rice next testified that at about 1:10 a.m. on December 9, 1992, she responded to a call from a house at 4954 West Kamerling. Upon arriving at the house, she was approached by C.G., who was crying. Officer Rice observed bruises on C.G.'s face, hands and arms. C.G. cried out, "Get him. Don't let him get away" as she pointed to a man running in the park across the street. C.G. told Officer Latonia that the man across the street had put the bruises on her. After a short foot chase, the officers grabbed Simmons and C.G. identified him as the man who had put the bruises on her.

Assistant State's Attorney Raymond Regner next testified that on December 9, 1992, he gave Cassell her *Miranda* rights and Cassell agreed to give a statement. Cassell stated that she and Simmons were good friends and that she picked Simmons up at about 7:30 p.m. on December 8, 1992. Cassell agreed to drive Simmons to C.G.'s house. At 9:30 p.m., she parked in an alley next to C.G.'s house. Simmons told her to wait. Cassell saw Simmons pulling C.G. out of the apartment building by her collar and noticed C.G.'s head tilted to the side, away from Simmons' grasp. Simmons sat in the front passenger seat, pulled C.G. into the seat, and forced C.G. over his lap. Simmons was shouting at C.G. and spitting in her face. Simmons was also beating C.G. on her face and body with his hands and fists while she was lying in his lap. Cassell then ordered C.G. to get down on the floor of

the passenger's side and sit between the dashboard and the front seat. Cassell stated that as Simmons was beating C.G., he was shouting "Shut up Bitch" and "Bitch, I should kill you." Cassell stated that she drove toward Caldwell and Oakton, to an area with trees. As she was driving, Simmons shouted "Bitch, get in the back." C.G. replied "just don't hurt me." Cassell then stated that she saw C.G. climb over the front seat and saw Simmons climb over the seat after her. Cassell then stated that she got out of the car to make a phone call and that when she returned, she saw Simmons having sex with C.G. Cassell then got back into the car and started driving. She heard Simmons order C.G. to climb back into the front seat and then order C.G. to perform oral sex. Cassell stated that as she was driving away from Caldwell and Oakton, Simmons grabbed C.G.'s hair and forced her head down on his penis and forced it up and down several times.

Cassell stated that as she continued to drive, she heard Simmons order C.G. into the back seat again and say "Bitch, take your pants down." She stated that she saw the struggle between Simmons and C.G. and saw Simmons punching C.G. Cassell stated that she stopped the car at an alley near Simmons' mother's house and watched as Simmons carried C.G., who was wearing no shoes, into the alley. Cassell stated that after Simmons and C.G. got out of the car, she drove home. She arrived home after 1 a.m., on December 9, 1992.

Assistant State's Attorney Regner also testified that Simmons gave him a statement. In that statement, Simmons stated that Cassell took him to C.G.'s house, and he went in and got C.G. He stated that Cassell drove them to Caldwell and Oakton. Simmons ordered C.G. into the back seat and had intercourse with her.

The trial court found defendant Simmons guilty of aggravated criminal sexual assault, home invasion and aggravated kidnapping and sentenced him to three consecutive 15-year terms of imprisonment. The trial court found defendant Cassell guilty of aggravated criminal sexual assault and aggravated kidnapping and sentenced her to three consecutive six-year terms of imprisonment, one for each penetration, on the aggravated criminal sexual assault charges.

Both defendants claim on appeal that the trial court erred in refusing to allow C.G. to invoke her fifth amendment privilege. Defendant Simmons also claims that he was not proven guilty beyond a reasonable doubt and that he received ineffective assistance of counsel. Defendant Cassell also claims that she was not proven accountable for aggravated criminal sexual assault beyond a reasonable doubt and that the trial court admitted inadmissible hearsay.

We now turn to the defendants' contention that they were denied a fair trial when the trial court refused to allow the victim, C.G., to

invoke her fifth amendment privilege not to testify. The defendants claim that, at the very least, the trial court should have conducted a hearing to determine whether C.G. was in danger of incriminating herself.

■ The privilege against self-incrimination guards against the compulsory disclosure of facts tending to establish criminal liability. *People v. Redd*, 135 Ill. 2d 252, 553 N.E.2d 316 (1990). Although a witness in a criminal case has the privilege to refuse to answer questions that tend to incriminate her, the protection secured by the fifth amendment is confined to those instances where the witness has reasonable cause to believe she might subject herself to prosecution if she answers. *Redd*, 135 Ill. 2d at 304. Neither an unreasonable fear of self-incrimination nor a mere reluctance to testify is a ground for claiming the privilege. *In re Zisook*, 88 Ill. 2d 321, 430 N.E.2d 1037 (1981). Once a witness asserts her fifth amendment privilege not to incriminate herself, the trial court must then determine whether, under the particular facts, there is a real danger of incrimination. *People v. Redd*, 135 Ill. 2d at 304, 553 N.E.2d at 339.

■ Applying these principles here, it is clear that the trial court properly determined that C.G. had no right to assert the fifth amendment privilege. When the prosecutor asked C.G. whether she was at home around 9 p.m. on December 8, 1992, the night of the incident, C.G. responded that she could not remember everything that happened that evening and she was not sure if she was home at that time. C.G. then stated that she wanted to "plead the fifth." The trial court then asked C.G., "Well, without going into any detail, what is it that you think might incriminate yourself? What would put you in trouble?" C.G. responded, "I do not remember alot [*sic*] of things that happened. I can vaguely remember." The trial court then stated:

> "Okay. Then just do the best you can, but if I see there is some area that may put you in criminal jeopardy that you would be charged with a crime, I will stop the proceeding. Otherwise, I don't see before me right now, unless you can tell me any basis for the 5th Amendment. That is a privilege that goes to a defendant or a person who might be charged with a crime."

The trial court then asked C.G. whether she feared that she might be charged with a crime. C.G. shook her head "no" and explained that she did not want to say anything that was wrong because she did not remember a lot of things and she did not want to say anything that would incriminate herself. The prosecutor then proceeded to question C.G.

Later, C.G. was asked who was hitting her, where she was being hit, and how many times she was hit. When she was asked what she

was hit with, C.G. again told the trial court that she would like to take the fifth. The court again explained to C.G. that if it saw that C.G. was in jeopardy of possibly being charged with an offense, the court would interrupt her, but until there was a possibility that that would occur, C.G. did not have a right to plead the fifth. C.G. responded that she was unable to remember a lot of things. The court told her to do the best that she could and tell the truth as best as she could recall.

Defendants now assert that C.G. attempted to plead the fifth because she was afraid that by testifying that Simmons did not sexually assault her, which was contradictory to statements she had given police officers, she would be perjuring herself. After trial, C.G. did provide a statement recanting her testimony that Simmons had sexually assaulted her. However, when questioned by the trial court, C.G. never expressed that she was in fear of being charged with the crime of perjury or any other crime. Regardless, even if C.G. had expressed a fear of being charged with perjury, that fear would not have entitled her to invoke the fifth amendment. See *People v. Gossitt*, 259 Ill. App. 3d 825, 630 N.E.2d 1224 (1994). Therefore, the trial court correctly determined that C.G. was merely reluctant to testify and had no right to assert the fifth amendment privilege. While defendants claim that the trial court should have conducted a hearing to determine whether C.G.'s testimony could incriminate her, we find that the trial court here made a sufficient inquiry as to whether C.G.'s testimony would be self-incriminating and had an adequate basis for determining that it was not.

■ Defendant Simmons next claims that he was not proven guilty beyond a reasonable doubt of any crime. The relevant inquiry for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Frieberg*, 147 Ill. 2d 326, 589 N.E.2d 508 (1992). Although we will address each of defendant Simmons' allegations of error, we note that the evidence introduced at trial was more than adequate to prove Simmons guilty of the crimes charged beyond a reasonable doubt.

■ Defendant Simmons first claims that he was not proven guilty of aggravated criminal sexual assault since there was no evidence of any sexual contact or penetration by the use of force or the threat of force. Simmons claims that the evidence revealed that C.G. consented to have intercourse with him. Simmons points out that when asked at trial whether she consented to have sex with Simmons, C.G. responded, "Not at first, but then I did." However, a review of the

complete testimony at trial reveals that C.G. acquiesced in having intercourse with Simmons only after Simmons exhibited significant force against her and threatened to kill her. Evidence revealed that Simmons jarred the apartment door from the hinges, dragged C.G. out of the apartment and into a car and repeatedly beat and threatened to kill her during intercourse. We do not find that C.G.'s decision to have intercourse with Simmons in order to avoid suffering further harm constitutes consensual intercourse.

■ Simmons next claims that the State failed to prove that he penetrated C.G.'s anus with an object. However, the emergency room nurse testified that C.G. told her that defendant stuck an object in her "butt." In addition, medical evidence revealed that spermatozoa was present in C.G.'s anus. This evidence was sufficient for the trial court to conclude that Simmons sexually penetrated C.G.'s anus.

■ Simmons' next allegations regarding whether he was proven guilty beyond a reasonable doubt concern his conviction for aggravated kidnapping. Simmons first claims that the testimony was insufficient to prove that he had a gun in his possession during his encounter with C.G. However, C.G.'s testimony that she thought she saw a gun in Simmons' pocket is sufficient to support the aggravated kidnapping charge.

Defendant also claims that he was not proven guilty of aggravated kidnapping because the State failed to prove the element of secret confinement since at all times when C.G. was in Cassell's automobile, she was in the public domain. Secret confinement can occur in a automobile. *People v. Harris*, 68 Ill. App. 3d 12, 385 N.E.2d 789 (1979). We find the element of secret confinement satisfied here since C.G. was taken from the apartment by force, confined to the car by the use of force and the threat of force, and transported to a remote location. During much of C.G.'s encounter with Simmons, she was either forced to sit on the floor of the front passenger seat or to lie down in the back seat. She was therefore blocked from public view.

■ Simmons next claims that the aggravated criminal sexual assault charge that alleged kidnapping as an aggravating factor fails to sufficiently state an offense and is therefore void. We have reviewed the indictment and find that it sufficiently apprised Simmons of the nature of the offense with which he had been charged.

■ Defendant Simmons next claims that the State failed to prove the charge of home invasion as charged in the indictment. Simmons points out that the indictment on home invasion charged that Simmons entered C.G.'s dwelling place while armed with a gun and threatened the imminent use of force upon C.G. The evidence at

trial, however, showed that Simmons entered the apartment of C.G.'s neighbor. We do not find this variance between the indictment and the evidence produced at trial to be fatal. In order to vitiate a conviction based on a faulty indictment, there must be a material variance between the allegations in the charging instrument and the proof at trial that is of such character as to mislead a defendant in preparing his defense or expose him to double jeopardy. *People v. Godina*, 223 Ill. App. 3d 205, 584 N.E.2d 523 (1991). We do not believe that the indictment's reference to C.G.'s apartment rather than to the neighbor's apartment denied defendant the opportunity to prepare a defense. Defendant was fully informed of the incident from which the home invasion charges stemmed.

■ Simmons next claims that there was no testimony that he entered the apartment without authority. Simmons claims that the testimony showed that he simply entered the apartment through an open door. However, evidence was introduced at trial to show that the back window of the apartment had been shattered and the door frame had been broken and was in splinters lying on the floor.

■ Defendant Simmons' last contention is that he was denied effective assistance of counsel when his trial counsel failed to conduct any pretrial investigation, impeach the victim, object to inadmissible hearsay and conduct effective cross-examination of the State's witnesses. A defendant receives ineffective assistance of counsel when. his counsel's conduct falls below an objective standard of reasonableness and counsel's shortcoming prejudiced defendant and deprived him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). Applying this standard, we do not find the conduct of Simmons' trial counsel to be ineffective.

Simmons first claims that his trial counsel failed to interview the victim, C.G., and take a statement from her recanting the allegations she made to police. However, it is clear from the record that Simmons' trial counsel did in fact interview C.G. prior to trial. We cannot say that counsel was ineffective in failing to obtain a statement from C.G. recanting her testimony, since we cannot assume that during that interview C.G. recanted her claim that Simmons assaulted her.

Defendant Simmons also claims that his trial counsel failed to develop devastating impeachment by exploring the continuing contact between C.G. and Simmons while Simmons was in jail. However, the court was aware that C.G. had a continuing relationship with Simmons, the father of her child. Thus, we do not believe that further exploration of C.G.'s relationship with Simmons would have affected the verdict.

Simmons also claims that his trial counsel was ineffective in allowing the State to introduce the hearsay testimony of police officers and medical personnel as to what C.G. told them after the incident took place. Although Simmons has not specifically addressed what testimony he takes issue with, defendant Cassell more fully addresses this issue in her appeal. As explained later in this opinion, the presumption that the trial court considered only competent evidence has not been overcome.

As for Simmons' claim that his trial counsel failed to conduct an effective cross-examination of the State's witnesses, Simmons has failed to state why cross-examination was ineffective or direct us to any specific instances in the record where he believes counsel was ineffective. Our review of the record does not reveal any deficiency in trial counsel's cross-examinations. We therefore conclude that defendant Simmons received a fair trial and that his convictions should be affirmed.

We now turn to defendant Cassell's remaining allegations. Cassell claims that she was not proven accountable for the sexual assault of C.G. because the evidence showed that she merely drove the car while Simmons assaulted C.G., not that she agreed to aid Simmons or promote or facilitate the offense. A person is legally accountable for the conduct of another when, either before or during the commission of the offense and with the intent to facilitate such commission, she solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense. 720 ILCS 5/5—2(c) (West 1992). Words of agreement are not essential to establish a common purpose to commit a crime. *People v. Coleman*, 223 Ill. App. 3d 975, 586 N.E.2d 270 (1991). Rather, courts look at the circumstances surrounding the perpetrating of the crime, such as defendant's presence at the scene of the crime, the maintenance of a close affiliation with the perpetrator after the commission of the crime and the failure to report the crime. *Coleman*, 223 Ill. App. 3d at 992. "[I]t has been invariably held in this State that a defendant may be held accountable for aggravated criminal sexual assault when [s]he is aware that the offense is being committed by another in [her] presence and does nothing to disassociate [her]self from the criminal activity, even if [s]he does not actively participate in the crime." *People v. Griffin*, 247 Ill. App. 3d 1, 7, 616 N.E.2d 1242 (1993).

In *Griffin*, 247 Ill. App. 3d 1, 616 N.E.2d 1242, two men pulled the victim into a car driven by defendant. Defendant drove to a housing project while the other two men beat and sexually assaulted the victim. The defendant ignored the victim's pleas for help. The defendant then drove the victim to her aunt's house and let the barefoot,

crying and bruised victim leave the car. The court found this evidence sufficient to prove the defendant guilty of aggravated criminal sexual assault based on accomplice liability. The defendant did not dissociate himself from the crime after he knew it was being committed in his presence, he drove the car during the entire incident, fled the scene with the perpetrators and made no attempt to report the crime.

 Our role is to review the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Nitz*, 143 Ill. 2d 82, 572 N.E.2d 895 (1991). We find that the evidence here was sufficient to prove defendant Cassell accountable for C.G.'s sexual assault. Cassell drove Simmons to C.G.'s building and watched as Simmons dragged C.G. out of the building by her collar and began beating her. Cassell also hit and beat C.G. Defendant then drove Simmons and C.G. to a remote location where Simmons threatened to kill C.G. and then sexually assaulted her. When C.G. locked Simmons out of the car and asked Cassell to drive away, Cassell refused and let Simmons back into the car. After C.G. was assaulted two more times in the next four hours, Cassell drove C.G. and Simmons toward Simmons' mother's house and threatened to kill C.G. if she told anyone what had happened. Cassell drove away from the scene as Simmons dragged the victim into an alley and defendant failed to report the crime. Cassell's actions provide even more compelling evidence for finding accomplice liability than in *Griffin*, since Cassell more actively participated in the crime by beating C.G. and threatening to kill her if she told anyone what had happened.

 Defendant Cassell also contends that because C.G. testified that only her initial sexual encounter with Simmons was nonconsensual, Cassell can only be guilty of one and not three penetrations. C.G. testified that initially she did not consent to have sexual intercourse with Simmons, but later she did acquiesce. C.G. stated that she never consented to rectal penetration. However, the trial court noted that C.G. had been forcibly taken from her apartment building, was beaten throughout her encounter with Simmons and Cassell and believed Simmons had a gun. Thus, the fact that C.G. later acquiesced in having sex with Simmons does not mean that her actions were voluntary. C.G. tried to lock the doors when Simmons left the car and asked Cassell to drive away. This indicates that she did not choose to have sexual contact with Simmons.

Defendant Cassell next contends that the trial court erred in allowing hearsay testimony of a flash radio message issued by Officer

Vandenbranden stating that a female had been kidnapped at gunpoint and in allowing Officer Vandenbranden to testify that two witnesses told him that the offender was Simmons.

▉ Hearsay is an out-of-court statement offered to establish the truth of the matter asserted. *People v. Rogers*, 81 Ill. 2d 571, 411 N.E.2d 223 (1980). Our supreme court has held it is not hearsay for a police officer to recount the steps taken in the investigation of a crime and describe the events leading up to the defendant's arrest where such testimony is necessary to fully explain the State's case. *People v. Simms*, 143 Ill. 2d 154, 572 N.E.2d 947 (1991). Furthermore, a police officer may testify about his conversations with victims or witnesses when such testimony is offered, not to prove the truth of the matter asserted, but to show the investigative steps taken by the officer. *Simms*, 143 Ill. 2d at 174.

▉ The trial court in this case stated that it would consider the substance of the flash radio message, not for the truth of the matter asserted, but only to understand the police officer's investigative procedures. Thus, defendant Cassell has not overcome the presumption that the trial court in this bench trial considered only competent evidence. See *People v. Coleman*, 222 Ill. App. 3d 614, 584 N.E.2d 330 (1991).

▉ Defendant Cassell's final claim is that the trial court erred in admitting hearsay testimony of emergency room nurse Severin that C.G. was dragged from her apartment by her ex-boyfriend. There is an exception to the hearsay rule for statements made to medical personnel for purposes of medical diagnosis or treatment. 725 ILCS 5/115—13 (West 1992). Thus, C.G.'s statement that she was dragged from her apartment was admissible under this exception. However, the part of C.G.'s statement referring to her ex-boyfriend as the perpetrator was not admissible under this exception since the identity of the person who attacked her was not necessary to her receiving proper medical treatment. *People v. Perkins*, 216 Ill. App. 3d 389, 576 N.E.2d 355 (1991). However, we consider this error harmless, in light of the fact that there is no indication that the trial court, in this bench trial, considered nurse Severin's testimony other than for evidence of the medical treatment given to C.G.

Accordingly, for the reasons set forth above, defendant Simmons' and defendant Cassell's convictions are affirmed.

Affirmed.

GORDON and HOURIHANE, JJ., concur.